CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY
*v.* MATTHEWS.

Opinion delivered May 2, 1932.

*Thos. S. Buzbee, Geo. B. Pugh* and *H. T. Harrison,* for appellant.

*Tom J. Terral,* and *Gaughan, Sifford, Godwin & Gaughan,* for appellee.

MEHAFFY, J.   This suit was brought under the Federal Employers' Liability Act for personal injuries which appellee alleged were caused by the negligence of the appellant.

He alleged that, while in the discharge of his duty as fireman in the defendant's yards on a switch engine, it became necessary for him to mount the tender for the purpose of measuring the oil contained in said tender, and, while he was in discharge of his duties about 9:30 o'clock at night, he stepped in some crude oil that had been carelessly and negligently spilled on top of the tender by agents, servants and employees of appellant; that it was dark, and he was unable to see the crude oil; that as he stepped into the oil he slipped, lost his balance,

and fell forward, so that his left foot caught in the bracket on the edge of the tender, throwing him into the small place between the tender and the engine cab; that he was severely injured, crushed and bruised; that his hips, sides, pelvis and back were badly wrenched, bruised and sprained; that his injuries are permanent; that he suffers, and will continue to suffer the balance of his life, mental and physical pain; that, after receiving his injuries, he continued to work as fireman for about three days, and was then forced to give up his employment on account of the pain being so severe, and go to appellant's hospital, where he remained for about ten days, and where he returned for treatment at intervals over a period of about eight months; that he was told, when he was discharged from the hospital, by appellant's physician and surgeon that he was not permanently injured, but was merely sore and bruised, and that this would leave him after he had returned to work. His condition became worse, and he cannot perform any labor.

Prior to his injury, he was strong and healthy, thirty-two years of age, a locomotive fireman, and able to do the manual labor connected with same; that, as a result of his injury, he is wholly incapacitated and will so continue in the future; that appellant was negligent in failing, refusing, and neglecting to furnish a safe place in which to work; that appellant knew, or by the exercise of care could have known, that crude oil spilled on top of the tender of the locomotive was dangerous and unsafe; that appellant's physician advised appellee to return to work, and relying on this advice, he did return to work, and in so doing, aggravated his condition.

The appellant answered denying all the material allegations of the complaint as to liability and damage, and alleged that the condition, if it did exist, was obvious, and appellee assumed the risk.

Appellant, as a further defense and bar to the plaintiff's cause of action, interposed the defense of a compromise settlement and release.

According to the testimony of the appellee, he was a locomotive fireman for the appellant, a married man, and thirty-two years of age. At the time of his injury, in February, 1930, he was firing on a switch engine at the Biddle yards at Little Rock. He was called to report for duty at 9:30 in the evening. The name of his engineer was Eubanks.

The engine was fired with crude oil, and was filled before appellee went to work. He got there about 9:15 and went to his engine, No. 1823. No one was on the engine when he got there that night. His duty was to get on the engine and look at the supplies, the water, oil and fire-boxes. The oil is measured before the engine starts out, and again when it comes in. The first thing he did when he got to the engine was to look at the fire-boxes and the water in the boiler. He then went to measure the oil. They are supposed to fill the tank before the fireman gets there. He had to get up by the ladder of the water tank. He got up on the engine and looked at the fire-box and water, and then went to measure the oil, and looked at the oil gauge. There was no light on the cab, but he could hold up the rod and see the oil on the rod. As he let the rod down, he turned around and his right foot slipped from under him, causing him to fall between the engine and the tender under the cab. After he had fallen down, he caught the grab iron and pulled himself loose. He then sat down and did not get up any more until around 2 o'clock. He could hardly get up then.

The engineer was absent, and the switchman was not there at the time of the accident. Appellee's brother-in-law came up about the time he fell.

The oil that had spilled was about two inches deep, and on the ledge of the water tank. There was a rim or hip on the side of the engine, and you could not see the oil because there was no light in the cab. If there had been a light in the cab, he could have seen it. Engineers will not leave the light on the cab because it

blinds them, and they took them out. There was a light about 20 feet away, but the raised place on the engine caused a shadow so that he could not tell what was there. They spill oil occasionally, but they always take the engines to the steam hose and wash the oil off. They neglected to do this that night.

Appellee then described his injuries, and his treatment by the appellee's physician and surgeon, Dr. Runyan, and the physician told him he would get all right, to take exercise.

About 15 or 20 days after he was hurt, he tried to work again. The physician told him, that, if he would do this, he could work the soreness out; that he did not think it amounted to anything, and to go back and make a trip or two. He was released from the hospital to go back and work a day or so and then return to the hospital. He made about three trips and was again examined by Dr. Runyan, but he got worse all the time. He made the trips that the doctor told him to because he was poor and needed the money.

After he was taken out of employment by appellant, he drove a truck between Little Rock and Hot Springs for Terry Dairy Company, and got his brother to help him. He could not have done the work by himself. His brother did the loading and unloading. His condition did not improve, but grew worse.

He received the check for $40, but did not see any letter. The mail came and his wife opened it, and brought the check to appellee, and she misplaced the letter. He was in the hospital once before about two months when his thumb was mashed off, and they kept him on the pay roll; sent him a check every month. When check was handed to him by his wife, he thought that they were paying him as they did before, and indorsed the check. The doctor had told him he was going to get all right.

He did not know there was any statement in the check about the injury when he indorsed it. He did not know that there was any release sent to him. He thought

the check was sent as they sent him checks before when he was injured. He did not read it and would not have settled, and would not have cashed the check, if he had known that it was sent to him in final settlement. He did not know how badly he was hurt at that time, and would not have settled then. His wife told him the check was for $40, and he indorsed it, but did not look at the face of it. Witness had signed a statement which was presented to him, introduced in evidence, and read to the jury. The statement signed by him, among other things contained the following:

"When I made this step, I swung down with my right foot, and when I did I missed the upper deck on engineer's side and went down to the lower deck of the engine and at the time I felt a pain in my left groin and hip. The reason that I missed the upper deck was because I was such a large man that the opening between the cab and tank of this engine was not quite wide enough for a man of my size to get down through. I weigh 210 pounds and am broad, and I suppose that the opening between the back of the cab of this engine and the front of the tank was about 16 inches wide."

The statement was dated March 17, but was made earlier. Witness then identified time slips which were introduced in evidence, showing the trips that he made after this injury.

Witness had not taken the engine out of the round house. The hostlers fill the engines with water and oil, take them up and wash them off, and put sand on them, but they did not do it in this instance. The engine was at the place where witness was supposed to get it. The gauge showed it was full of oil. The oil was spilled all over the ground. He did not notice the oil until he had fallen. After he fell he stepped back upon the deck, and there was oil on his feet and hands. Oil was scattered all along on the tank, pretty thick for three or four feet. He discovered the oil by the light when they backed up. If there had been a light on the cab of the engine, he

would have seen the oil and called the round house men to clean it up.

Witness then identified a letter which he had received from the claim agent in which it is stated that on April 5 a draft and release in the sum of $40 on account of his injuries had been sent him.

Several witnesses testified in behalf of plaintiff corroborating most of his statements, and physicians testified about his injuries, and testified that they were permanent.

A number of physicians for the defendant testified to the effect that they did not think the injuries were permanent. A number of other witnesses testified on behalf of the appellant, their testimony being in conflict with some portions of appellee's testimony.

The appellant also introduced the following draft:
"Form 1631-A-5-28-200 bks.                    No. 74916
"THE CHICAGO, ROCK ISLAND & PACIFIC
RAILWAY COMPANY
"$40.00                Little Rock, Arkansas, April 5, 1930.

"Pay to the order of J. O. Matthews forty and no/100 dollars for full settlement of any and all claims growing out of his injuries sustained at or near Biddle, Arkansas, on or about February 27, 1930, while employed as fireman. 30-12080.

"TO CARL NYQUIST, Treasurer,
    "The C. R. I. & P. Ry. Co.
        "Chicago, Ill.
                "(Signed) W. J. Flaherty,
                        "Inspector & Adjuster."

There was a verdict and judgment in favor of the appellee in the sum of $10,000 less $40.

A motion for a new trial was filed by appellant and an additional motion on the grounds of newly discovered evidence. Both motions were overruled, and the case is here on appeal.

The appellant relies on a release, and states that the evidence was not sufficient to create an issue of fact for the jury's determination as to the validity of the compromise settlement.

In the first place, there is no evidence that any settlement was ever made. The appellant's witnesses do not claim that a settlement was made, or that any agreement was ever made with appellee, except they say that the statement in the face of the check was a settlement.

According to the evidence of appellant's witnesses, appellee not only did not sign the release which he was requested to sign, but positively refused to sign it.

Appellee's testimony is that when the check came, his wife opened the envelope, brought him the check or voucher folded, and told him that it was a check for $40 and he indorsed it. He did not see the release, and did did not see the face of the check. According to his testimony, he thought they were sending him checks as they did when he was injured once before, and for that reason indorsed it without looking at it. He testified that when he was injured once before the appellant kept him on the payroll, and sent him a check every month, and he thought that they were doing the same thing when he received this check.

This evidence about having received checks monthly when he was injured before is contradicted by appellant's witness, the claim agent, but this was a question of fact for the jury, and what appellant calls a compromise was appellee's indorsement of the check which had been sent him, although there is no evidence that any agreement had ever been reached, or that the amount of $40 had ever been discussed or mentioned.

The appellant's witness himself testified that appellee stated he wanted $100 and the witness, the claim agent, declined to give it, and appellee went away. No reason is given by the claim agent for fixing the amount at $40 and sending appellee a check.

Appellant cites and quotes at length from *Odrowski* v. *Swift & Co.*, 99 Kan. 163, 162 Pac. 268, and states that the decisions of the Supreme Court of Arkansas are in harmony with the Supreme Court of Kansas in the case cited. The cases cited in *Odrowski* v. *Swift & Co., supra,* sustain the contention of appellee in this case, and none of them, we think, supports the contention of appellant.

In the case relied on by appellant, the employee alleged that the release was procured by misrepresentations made by the company's physician, but the employee in that case did not testify that he was induced to sign the release because of the statement of the physician, but that he signed it without knowing what it was or without reading it. There was no evidence of any fraud, and he was not indorsing the check, but signing a release, and the court in that case recognized the rule that the modern tendency is to extend, rather than to restrict, the power of courts to grant relief against contracts induced by unfair dealing. But in that case there was no misrepresentation made, no effort to get him to sign the release, but he signed it voluntarily without reading it.

One of the cases cited by the Kansas Court is *Ladd* v. *C. R. I. & P. Ry. Co.*, 97 Kan. 543, 155 Pac. 943. In that case the company's physician examined the injured party and stated to her that he found no bruises or permanent injuries or broken skin, but that her neck was swollen, and directed her to go home and bathe her neck in hot water, to take the swelling out. Some days after this, the claim agent of the railway company went to the home of the injured party, paid her $5, and procured her signature to a release. The court held the release was not binding, and said:

"Authorities are ample to sustain an avoidance of this release on account of the mistake of fact made by the plaintiff." It then cites many cases to support the rule announced.

Appellant cites also 2 Black on Rescission & Cancellation, § 384. This author, however, says in § 389: "In regard to cases of this sort, it is said that settlements made with injured employees immediately after the accident are not looked on with favor by the courts, and that, while the law favors the adjustment of controversies fairly made, yet settlements of claims for personal injuries made with persons who are poor, and without the aid of counsel, or the benefit of independent advice, should be closely scrutinized."

In this case, the undisputed evidence shows that there was no settlement at all.

Counsel also cite and rely on *Kansas City Sou. Ry. Co.* v. *Armstrong,* 115 Ark. 123, 171 S. W. 123. In that case the injured party wrote into the release herself the following: "I understand that I am settling all claims against the Kansas City Southern Ry. Co.", and then signed the release. The court said in that case: "They were expressly contracting with reference to injuries received on a certain occasion, the claim was unliquidated, and the contract shows that the parties intended to settle all matters between them relating to that incident."

In the instant case there is nothing to show that the parties intended to settle. The only claim the appellant makes is that there was a statement in the face of the check that it was in settlement of his injuries, but, as we have already said, the undisputed evidence shows that appellee did not know this. It is also shown that appellee refused to make a settlement or sign a release.

Appellant calls attention to 23 R. C. L. 385-386. On page 395 of 23 R. C. L., it is stated: "A nominal or grossly inadequate consideration for a release will be given serious consideration as affecting the question of fraud in its procurement. When due weight is given to other surrounding conditions, and there is evidence that the consideration is inadequate, it is a circumstance which, in connection with other circumstances, may be

submitted to the jury, and, if grossly inadequate, it alone is sufficient to carry the question of fraud or undue influence to the jury, and where there is inadequacy of consideration, but it is not gross, it may be considered in connection with other evidence on the issue of fraud, but will not, standing alone, justify setting aside a contract or other paper writing on the ground of fraud. And therefore, on the question of fraud *vel non* in inducing an employee to accept benefits from a relief department in release of the master's liability for negligent injuries, his situation, conduct, and surroundings at the time, as well as the amount received, may be considered.''

On page 397 of 23 R. C. L. it is stated: ''There cannot be a release of a cause of action for personal injuries without unequivocal acts showing expressly or by necessary implication an intention to release. Generally the construction of the release as to the actual intent of the parties presents a question of fact to be determined from the surrounding conditions and circumstances, construed with reference to the amount of consideration paid and the language of the release itself. The amount of consideration paid should have considerable force in determining whether the release was simply paying the releasor for loss of time or some other specific element of damage, or whether it indicated payment of a substantial sum in consideration of which the releasee secured himself against all further developments and the releasor assumed the risk thereof.''

This is a statement of the principle of law governing in cases where injured parties sign a release where the act of the party is deliberate. The evidence in the instant case shows clearly that appellee never intended to sign a release for $40.

Appellee also calls attention to 53 C. J. 1213. The statement of the law in this volume, however, is substantially the same as in R. C. L.

Attention is next called to *Texas Co. v. Williams,* 178 Ark. 1110, 13 S. W. (2d) 309. In that case, however, the injured party not only signed a release, but was paid a substantial sum, $1,500, and the court stated that he admitted signing the release agreement, but that he signed it without knowing its contents. That was wholly different from indorsing a check as appellee did in this case, and refusing to sign a release. In that case he admitted he signed a release, and was able to read and write, and understand the nature of a contract.

This court, in *Barham v. Bank of Delight,* 94 Ark. 158, 126 S. W. 394, said: "The moment the plaintiffs indorsed the check and collected it, knowing that it was offered only upon a condition, they thereby agreed to the condition, and were estopped from denying such agreement." In that case the undisputed evidence showed that the check was indorsed by the party, knowing at the time that it was offered upon condition. He knew what the condition was, he accepted it, and agreed with the other party.

There is no evidence in the instant case tending to show that there was ever any agreement, or that appellee ever saw the face of the check. There is no evidence that he saw the letter said to have been written, or that he saw the release sent to him to sign, or that he knew of the existence of either of them.

This court said in another case: "Of course, if she accepted a sum, however small, as compensation for her personal injuries, or if she had signed the written release with a full knowledge of its contents, she could not recover at all, whether she offered to return the money or not, for a contract, fairly entered into, for the settlement of an unliquidated claim for damages would bar the right to recover more." *St. L. I. M. & S. R. Co. v. Smith,* 82 Ark. 105, 100 S. W. 884.

It certainly cannot be contended under the evidence in this case that appellee signed a release with full

knowledge of its contents. If he had been handed a release or had been told it was a release he was signing, or if he had known that he was signing a release, he would be bound whether he read it or not, unless there were other reasons for holding it void, but certainly the mere indorsement of a check would not, of itself, show that the appellee signed a release with a knowledge of the facts.

It was said: "This court has frequently held that a release executed by an injured party, relying upon the mistaken opinion of the physician of the party responsible for the injury, that it was slight and temporary, and not permanent, is not binding upon the party making it." *Mo. Pac. Ry. Co.* v. *Elvins,* 176 Ark. 737, 4 S. W. (2d) 528.

It is true that the plaintiff stated that, if he had known it was a release, he would not have signed it any way, but testimony clearly shows that the company's physicians told him that his injuries were not serious, and he would be well in a few days. It is wholly unimportant whether they were honestly mistaken or not. The presumption is that they were. If they made the statements to appellee, and he relied on them, it would be sufficient ground to set aside the release, even if appellee had known it was a release he was signing. If he did not know it, and simply indorsed the check in the ordinary way, a check like others he had received from the same company, he would have no reason to believe that it contained a release, and the release would not be binding.

It is next contended by the appellant that the undisputed testimony shows that plaintiff assumed the risk. The undisputed testimony shows that he got his engine where he was supposed to get it, that the hostlers had prepared it for him, that he did not know there was any oil on it, and that he could not see it because there was no light. The undisputed evidence also shows that prior to this time, if the hostlers spilled oil, they took the

engine to the steam hose and washed it off. The appellee did not know there was any oil on the engine, and he had no reason or knowledge of facts that would cause him to believe there was any danger.

It is next contended by the appellant that the court erred in the instruction given to the jury at the request of appellee. It is contended that instruction No. 1 given at the request of the appellee was erroneous, and the specific objection to that was that the paragraph in said instruction, submitting the question as to whether or not oil had been spilled, through the negligent acts of agents or servants of the defendant, or had been permitted to remain through the negligence of defendant's agents or servants, for the reason that there was no evidence upon which to submit this issue to the jury. In other words, the specific objection to this instruction is that there is no evidence that appellant was guilty of any negligence in spilling the oil or permitting it to remain there.

The appellee testified that he went to the engine where he was supposed to take charge of it, and that the oil was spilled on it, that the oil was put in by the hostlers, and that when they spilled oil it was their custom to take the engine and clean it off. · He testified that Eubanks was his engineer, and neither Eubanks nor the hostler, who put the oil in, and who it was alleged spilled it, nor any other witness was called to contradict this testimony of appellee.

No reason appears why the hostler who put the oil in that night did not testify. There was therefore ample evidence to submit the question to the jury, as was done in instruction No. 1.

No argument is made as to the other instructions. We have carefully considered all the instructions, and reached the conclusion that the court committed no error in giving or refusing instructions.

It is next contended that the court erred in overruling defendant's objection to the argument of plain-

tiff's counsel. There was no prejudicial error committed by the court here. *Pac. Mutual Life Ins. Co.* v. *Ware*, 182 Ark. 868, 33 S. W. (2d) 46; *Ark. P. & L. Co.* v. *Hoover*, 182 Ark. 1065, 34 S. W. (2d) 464; *Booth* v. *Racey*, 171 Ark. 561, 285 S. W. 29; *Black Bros. Lumber Co.* v. *Person*, 163 Ark. 40, 258 S. W. 976; *F. Keich Mfg. Co.* v. *Wallace*, 171 Ark. 647, 286 S. W. 815.

The court did not err in overruling appellant's motion for a new trial. *Jewel Coal & Mining Co.* v. *Whitner*, 170 Ark. 393, 279 S. W. 1031; *N. W. Ark. Farmer's Mutual Tornado Ins. Co.* v. *Osborn*, 180 Ark. 757, 22 S. W. (2d) 387; *Bradley Lumber Co.* v. *Beasley*, 160 Ark. 622, 255 S. W. 18; *Carden* v. *Montgomery*, 171 Ark. 1000, 287 S. W. 183.

There was substantial evidence on which the jury could find that the appellant was negligent, and that appellee indorsed the check in the manner and under the circumstances described by him, and the findings of a jury, if based on substantial evidence, will not be disturbed by this court.

The judgment is affirmed.