HUMPHRIES ET AL. *v.* KENDALL.

4-4818

Opinion delivered November 22, 1937.

*Owens, Ehrman & McHaney* and *J. M. McFarlane,* for appellants.

*J. H. Lookadoo,* for appellee.

MEHAFFY, J. This action was begun by the appellee in the Clark circuit court to recover damages against the appellants and others for injuries alleged to have been caused by the negligence of the appellants and Sam Mixson. The appellee alleged that on December 31, 1935, the appellant, Kroger Grocery & Baking Company, employed Sam Mixson and two other negroes to assist a white man named Cecil Thorn to haul a carload of flour from the Missouri Pacific station to the Kroger Store in

Magnolia, Arkansas; that appellee was working for Kroger Grocery & Baking Company in the Magnolia store and that Mixson was acting for the Kroger Company under the direct orders of appellant, C. A. Humphries, who was the store manager for Kroger Grocery & Baking Company at Magnolia; and that Mixson carelessly and negligently stacked the flour in an unsafe manner under the orders of Humphries; that appellee, while in the exercise of due care and acting under the orders of Humphries, was nearby checking the flour; that the entire stack of flour fell upon him, knocked him to the floor and injured him. An amendment to the complaint was filed alleging that Sam Mixson, acting for appellant, Kroger Grocery & Baking Company, was negligent in another particular, in that while stacking the flour he carelessly and negligently pushed, or allowed himself to fall against the stack of flour, knowing that appellee was in a position where the flour would fall upon him and cause him bodily injury, and that not only the flour, but Mixson as well, fell upon the appellee.

The answer originally filed was a general denial of the allegations in the complaint, and an affirmative allegation that appellee's injuries, if any, were caused or contributed to by his own negligence. By leave of the court, the appellants withdrew this answer and filed another, which merely denied each and every material allegation of the complaint and amendment, but did not plead contributory negligence.

The following is the substance of appellee's testimony:

Appellee was 30 years of age and married, living at Magnolia where he lived practically all of his life; was working for the Kroger Grocery & Baking Company and had been since about November 1, and receiving a salary of $7 per week. Prior to that time he had worked mostly for himself, and made from $1,200 to $1,500 a year; was working for a small salary because he expected to have a chance to get a better job at a higher salary, and he thought that the store managers received around $130 a month. On the morning of the

accident they were unloading some flour in the back of the store; Humphries was staying back there with the folks who were unloading the flour; after appellee returned from lunch Humphries told him to go back in the back of the store and check the flour that afternoon; appellee had never checked flour before; had never stacked flour other than move it around in the store and bring it from the back to the front; he knew nothing about the method of stacking flour; his job was to check it and keep count of the number of sacks; when they would unload it from a large truck at the back door onto the floor truck, appellee would mark it down. He stood at the back door when he first went to work; it was very cold and raining, and turned to sleet; his hands and fingers got so cold and numb he could not write, and he then went to a little stove near where they were stacking the flour; sat down on an apple crate with a pad on his knee, and just as he did this the flour hit him. Humphries was manager for the Kroger Company and was directing the stacking of the flour. Appellee became unconscious when the flour hit him, and then remembers being in an ambulance and was conscious for a moment. The next thing he knew he was in a hospital. Prior to the accident he was healthy and strong. Did not know what nerves were; was never nervous; does not know who sent him to the hospital; Dr. Carrigan waited on him and he supposes that he was the company doctor; since the injury he has pains in the back and the doctor gave him treatments for about two or three months for muscle injury in his back; the doctor then told him to go back to work and try to do some work and exercise; that his muscles needed exercise; he went back and worked two or three weeks; his back continued to hurt him and the doctor then wrote Humphries a note telling him that appellee could not work; appellee then went home and stayed in bed part of the time and was able to be up part of the time; the doctor finally dismissed him and told him that in a week all the soreness would be gone and he would be as well as he ever was, but he did not get well; had a nervous spell and they called in

Dr. McLeod of Magnolia; Dr. McLeod gave him some powders to quiet him and then sent him to Dr. Carruthers at Little Rock. Dr. Carruthers has been treating him from that time to the present; made him a spine brace, put him in bed at least four hours a day for weeks; he is still wearing the brace and has worn it constantly; he is not able to work now; is not any better than he was a year ago; his back aches so badly he can hardly live; has pain all the time; at times it is so severe it draws his head back; it seems like something runs up the back of his neck and hits his brain; he thinks he is gradually getting worse; is discouraged and despondent; before he went to work for Kroger he was in the restaurant business, but had sold out prior to that time; during the year after he sold his restaurant, he was working extra; does not know how much he made during that year before he went to work for Kroger. His testimony that he made $1,200 a year had reference to the time when he was running the restaurant; after he sold his restaurant he did not have regular employment more than six to eight weeks at a time; drew $2.50 a day for the time he was working; he worked about half the time; he had nothing to do with unloading the flour in the morning; worked up in front of the store; he knew nothing about the arrangement between Humphries and Thorn with reference to unloading the flour; knew that Thorn had a truck and knew that he unloaded cars of merchandise for merchants; does not remember seeing Thorn around when the flour was being unloaded; does not recall any conversation with Humphries on the morning of the accident; when he went back to work they gave him the lightest work, but his back pained him so he had to quit; Dr. Horne or Dr. Carrington made X-ray pictures of his back; does not remember whether they gave him any report; they might have given it to his wife; they told him his back was not broken; he made a statement; Humphries told him he wanted him to go to Little Rock and have doctors examine him; he went, but they first sent him to a lawyer's office; he did not know they wanted a statement; the lawyer's secretary started ask-

ing him some questions and she was taking it down; he did not realize that they called him up there just for a statement, but when they got through they told him they did not want the doctors to examine him, but the statement was all they wanted; he identified his signature to the statement. The statement was here introduced in evidence, and among other things he said in the statement that he did not know who hired the negroes, and that he did not know what caused the sacks to fall; it was also in the statement that when Mr. Thorn gets a job he hires negroes to haul it for him; the statement also shows that witness is better and believes he is able to go back to work. He testified that when he made the statement he told the truth so far as he understood it. He heard Humphries tell the negroes how to stack the flour, but at the time he made the statement he supposed Thorn told them how to load it in the truck; Humphries told them how and where to stack the flour; does not know why that was not put in the statement. When he made the statement he wanted to tell the truth and is telling the truth now; he did not have a lawsuit at that time. The statement covers the facts, but it may not have been in his words; he did not know at the time who hired the negroes; has no information from Humphries about who hired the negroes; he simply knows what they said, and did not hear the trade made; he did not know any of the negroes at the time; moved to Little Rock in September, 1936; rode up in an automobile; drove some himself, he remembers telling Dr. Carruthers the history of his case and gave a statement to Dr. Pate, and then called on Dr. Brown and told him about it; he also told Dr. Shuffield; in Little Rock he lived on Louisiana street about five weeks, and was in bed part of the time; was up and around some; when his back was not hurting he would drive the automobile; he is now wearing a brace and can walk; his wife works for the telephone company and was transferred to Little Rock, and that is why they moved to Little Rock; they are now living on Commerce street; he sees Dr. Carruthers once every week or two weeks; does not think he told Humphries that he did not

blame Kroger. When he went to Little Rock at the request of the company his wife went with him and he thought he was going for a medical examination; does not remember telling the girl that the flour was stacked by Thorn's negroes; he does not know who hired the negroes, but he does know that Humphries came back and told them where and how to stack the flour.

It was agreed that the Kroger Grocery & Baking Company is a corporation.

Mrs. Clarence Wilson testified that she lives in Magnolia and is a sister of appellee, and has seen him almost daily; prior to his injury he was in perfect health; his nerves were normal; before the first of April his condition was bad, but he did not entirely lose his mind until that time; appellee did not know her from any other person; at times she would have to hold appellee's hands to keep him from pulling his hair; that he went entirely crazy some time in April; he did not entirely lose his mind except for 10 or 12 hours; she nursed appellee off and on; witness talked to appellee three weeks ago and he was not crazy then; seemed to be in his right mind but nervous; he does not have crazy spells all the time; Dr. Carruthers started treating him before he left Magnolia and Dr. McLeod did not see him anymore; before appellee went to work for Kroger he worked in a cafe in Magnolia; appellee's physical condition is gradually growing worse, and his mental condition grew worse, but it seems now to be a little better.

O. M. Kendall testified in substance that he is a brother of appellee and works for the State Revenue Department as inspector; prior to appellee's injuries he was all right in every way; witness has been around him since his injury; he has pains in the head and has complained of this ever since the injury; at times he is normal and at other times he is crazy; he seems to be growing worse all the time; does not know how long appellee worked after he went back; witness lived on one side of the town and appellee on the other, about half a mile away; has not seen his brother driving a car and

does not know what he has been doing since he has been in Little Rock.

Sam Mixson testified in substance that he is 26 years of age, lives in Magnolia, has a high school education and attended Little Rock Baptist College in Little Rock for two years; that on the date that appellee was injured witness was working for Kroger Grocery & Baking Company; he was employed by Mr. Humphries, who was manager of the store. On the morning of the day of the accident, Mr. Humphries was standing in front of Kroger's when witness passed and Humphries said: "Boy, you want to work?" and he told him he did; that Humphries told him to line up some other boys to work in the store; wanted them to stack flour and help Thorn haul the flour; witness got three more boys and they worked all day; Mr. Humphries paid them 60 cents; took the money out of the cash register of Kroger store; witness was to stack the flour; another boy would pass the flour up to him; they were unloading the flour at the east end or back end of the store; they would hand the flour off the truck to the party who would place it on the hand truck; he would then roll it in to where it was to be stacked; the ceiling is 18 or 20 feet high; the screened-in pen where the flour was being put took not quite half the room; Humphries told him where to stack the flour and he was back there in the morning checking the flour and showed them where to begin stacking; witness had stacked flour for Kroger and other people; he was stacking it in the usual and customary way; he laid two stacks down lengthwise and then one sack crosswise; then another sack on top of the two sacks, and put two others crosswise to tie them in; in placing the flour the customary way is to pat it down as you stack it; that keeps it from creeping and falling; it settles it where it will not slide; witness was doing this and had stacked it between 10 and 12 feet high; Mr. Humphries came back and told him he must stack it higher in order to get it all in; they quit work at 12 o'clock and went back at 2:30; it was raining and cold; Humphries told him he would have to stack it higher in order to get it all in; he did

not stack it in the afternoon like he did in the forenoon; Humphries had told them to hurry and witness told them he would stack it just as fast as it was handed up to him; he did not pat it out properly; he knew he was not doing it properly and Mr. Humphries knew it; the appellee was back there checking the flour in the afternoon; in the morning he had been up front; he moved close to where the flour was and told witness he would light the stove and get warm; he sat down by the stove; witness and the other boys were rushing and the flour tumbled over on appellee; two sacks fell; they were about 17 feet high; they fell because they were not stacked properly; witness also fell on appellee; they got the flour off of appellee and Mr. Humphries came back and carried appellee to the front of the store; it was 20 or 30 minutes before appellee said anything and he then groaned and said: "Oh, my back. Take me home"; they called Dr. Carrington; Mr. Humphries hired witness and the other boys; witness hired the other boys for the Kroger Grocery & Baking Company; he testified that he was one of the defendants, and if they rendered a judgment against him, they would just have to render it; it had rained in the morning; witness had stacked flour for Kroger before; Mr. Thorn had hauled flour for Kroger before; he had never worked for Thorn unloading flour; witness had not made a statement; he signed his name on a blank piece of paper when Mr. Humphries sent for him one morning; he just did what Humphries told him to do; Mr. Thorn wanted him to give a statement and he told him he was working for Mr. Humphries, and then he told him to wait a minute and went away and did not come back; heard Humphries ask Douglas to sign; witness said that was his signature and he was not positive whether there was any writing on the paper when he signed it; if there had been he would not have signed it; he did not tell Mr. Thorn and Mr. Humphries that he would sign another statement; he had signed one for Mr. Lookadoo; does not consider signing his name and age on a blank piece of paper making a statement; if Kroger's agent had come and asked him to give him a

statement, he would have done so, just as he did for Mr. Lookadoo; he went down with Mr. Thorn to Atlanta and moved some household goods; that part of the work was done for Mr. Thorn and he paid witness 20 cents extra for that; that made eighty cents he got that day; knows nothing about the arrangement between Thorn and Kroger's; he had helped haul flour to Kroger's before when Thorn hauled it.

Oliver Brewster testified to substantially the same things as Mixson.

Dr. Carruthers, a practicing physician and surgeon in Little Rock, testified that he had been practicing seventeen years; graduated from Baylor University; did post-graduate work at the University of Pennsylvania, and specializes in bone and joint surgery; knows appellee, who came to his office for examination and treatment on May 26, 1936; witness has been seeing him almost every week since that time and has been treating him; he came to witness' office accompanied by his wife and walked with the assistance of a cane; his principal complaint was inability to walk normally, pain in the mid-portion of his chest and in the back; witness found a curvature of the spine toward the left side; appellee was extremely nervous; talked incoherently and rambling; walked with hesitancy, dragging his right leg a little; there was a marked tremor and shaking of both arms; there was less reflex or knee-jerk on the left side; he also found ankylosis; there was a definite tenderness of the back; X-ray pictures revealed no fractures; witness then had a spinal puncture made; this was done by introducing a spinal needle into the lower portion of the spinal canal and drawing out fluid for examination; he also injected into the spinal canal an opaque substance known as lipidol for the purpose of observing it to see whether this substance would pass all the way up and down the spine; this test is to determine whether or not there is a block in the spinal fluid; appellee was then observed under the floriscope and the fluid passed as high as the seventh dorsal vertebra; normally the fluid would have passed up freely; this showed evidence of some waxy or sticky condition

that might have occurred from hemorrhage in the spinal canal; this indicated that there was a block in this portion of the canal; witness has been treating him almost weekly since; he is growing progressively worse; appellee is extremely nervous and witness referred him to Dr. Brown, a nerve specialist; the ankylosis indicates a disturbance in the reflexes across the spinal cord—involvement of the central nervous system; it could also involve the brain; appellee is totally disabled and his condition will grow progressively worse; his condition causes an intermittent type of pain; his condition could have been caused by flour falling on him and striking him in the back and head; appellee's heart and blood pressure were normal; a time or two appellee had fever, but witness attributed this to the fact that he had a cold; had him X-rayed thoroughly and no fractures were disclosed; appellee gave a complete history, but he had trouble in getting it; spent the whole afternoon; appellee told his story in incoherent and inarticulate manner; witness' diagnosis is not based entirely on subjective symptoms; he was able to verify them by some objective symptoms; appellee has lost seven pounds since being under witness' observation; the principal treatment prescribed was rest; Dr. Brown examined appellee on May 26; the oil was injected in the spine the first day witness saw appellee; the time that oil would stay in the spinal cord varies; there is some oil still in his spine; he thinks practically all of it; he did not take pictures of the oil, but observed it under floriscope; he could have made a picture of it; witness is not a nerve specialist and would not say whether there was any concussion in appellee's head; he left that to Dr. Brown; witness has treated appellee for about a year.

Dr. Brown testified that he specialized in mental diseases; examined appellee and there was a tendency to mental changes; pain and tenderness from the third to the seventh dorsal vertebra along the spine; testified to reflexes which indicated some trouble in the central nervous system, either in the spine or brain; witness was present when Dr. Carruthers injected the oil and saw it

stop about the seventh vertebra; it did not seem to go beyond that; that would indicate a blocking of some sort; it might be a disturbance of the brain or spinal cord; if several sacks of flour fell upon him and crushed him on the floor, knocking him unconscious, that would indicate that he had a concussion; the symptoms found by witness would be the natural result of such an injury; witness has seen appellee several times; it is hard to determine whether appellee's physical condition has improved or progressed downward; he was in a worse condition emotionally Wednesday than witness had ever seen him; appellee has been totally disabled and the probability is that he will be totally and permanently disabled so far as carrying on any productive work of any kind; his injuries would cause pain; there has been no picture made to determine whether the oil is still there; he does not know why the tremor would be in the arms when the injury was in his back unless it was due to a concussion of the brain; witness said he did not claim that appellee was insane; he thinks there can be a block in the spinal cord without paralysis; appellee could do some slight work sitting at a table, where he does not have to stand on his feet; witness testified at length as to appellee's condition.

Dr. Pate testified that he is a practicing physician and surgeon at Arkadelphia, a graduate of the University of Arkansas Medical School; examined appellee and found a very tender space on his back; seems to be some deviation of the third dorsal vertebra to the left; also a tremor to the extended arm, lips and extended tongue; his condition could have been caused by the accident; the injuries, he thinks, are permanent; did not have either Dr. Carruthers' or Dr. Brown's report before him; had seen these reports, but did not have them when he prepared his report; he relied on subjective symptoms to some extent, and partly on objective symptoms; the injuries he found indicated trouble in the central nervous system, somewhere in the brain or spine.

The above is, substantially, the testimony of appellee's witnesses.

The appellants' physicians who testified gave evidence conflicting with the doctors testifying for the appellee. Appellants' witnesses did not think his injuries were either serious or permanent. Dr. Rhinehart, however, testified that there were two kinds of oil used for injecting into the spine, one light and one heavy, and that you could see the heavy oil in the X-ray picture, but could not see the light.

Cecil Thorn testified that he was engaged in the trucking and transfer business around Magnolia; has known Humphries for a number of years; that he had a contract for unloading a car of flour for Kroger, for which he was to be paid $8.50. He testified at length that he was an independent contractor, and that while Humphries saw the negroes and engaged them, he did it for Thorn, and he and Humphries both explained the payment by Humphries by saying that it was done merely for convenience; that Thorn did not have the change, and that it was deducted from Thorn's pay. Both Humphries and Thorn gave testimony which was in conflict with the testimony of appellee's witnesses, as did also some other witnesses for the appellants.

There was a trial and verdict and judgment in favor of appellee against Sam Mixson and the appellants for $25,000. The case is here on appeal.

The appellants contend first that the court should have directed a verdict for them. Sam Mixson did not appeal. Appellants say: ''The principal defense of these appellants was that Sam Mixson was the employee of Cecil Thorn, an independent contractor.'' It is true that both Humphries and Thorn testified that Thorn was an independent contractor.

It is well settled in this state that the employer is not liable for the negligence of an independent contractor nor the servants of the contractor. The appellants cite *St. L. I. M. & S. Ry. Co.* v. *Yonley,* 53 Ark. 503, 14 S. W. 800, 9 L. R. A. 604, where the rule is stated as follows:

''In general it is entirely competent for one having any particular work to be performed to enter into agreement with an independent contractor to take charge of

and do the whole work, employing his own assistants, and being responsible. only for the completion of the work as agreed. The exceptions to this statement are the following: He must not contract for that, the necessary or probable effect of which would be to injure others, and he cannot, by any contract, relieve himself of duties resting upon him as owner of real estate, not to do or suffer to be done upon it that which will constitute a nuisance, and therefore an invasion of the rights of others."

"The vital test in determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer. Stated as a general proposition, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor. . . . An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work." *Mississippi River Fuel Corp.* v. *Morris,* 183 Ark. 207, 35 S. W. 2d 607; 14 R. C. L. 67; *W. H. Moore Lbr. Co.* v. *Starrett,* 170 Ark. 92, 279 S. W. 4; Thompson on Negligence, vol. 1, p. 570; *J. W. Wheeler Co.* v. *Fitzpatrick,* 135 Ark. 117, 205 S. W. 302; *St. L. I. M. & S. Ry. Co.* v. *Gillihan,* 77 Ark. 551, 92 S. W. 793.

Where, however, the employer is himself guilty of any negligence causing or contributing to the injury, he is liable to the injured party without regard to whether there is an independent contractor. Where both the independent contractor and the employer are guilty of negligence, the employer is liable, and wherever the employer interferes in any way with the work and superintends or controls its performance, this destroys the relation of independent contractor. R. C. L., Permanent Supplement, under the head of Independent Contractor, page 3525 *et seq.* In the volume referred to will be found many citations supporting the rule announced. See, also, 30 A. L. R. 518 *et seq.; Arizona-Binghampton Copper*

*Co.* v. *George M. Dickson, Admr.,* 22 Ariz. 163, 195 par. 538, 44 A. L. R. 881. This case is annotated and numerous cases are cited in the notes, but the authorities are in harmony on the proposition that if the employer interferes with the work or takes charge of any part of it, this destroys the relation of independent contractor.

Whether Mr. Humphries, the manager, was superintending or controlling the stacking of the flour was a question of fact, and appellee's witnesses testify that they were working for Kroger, and that Mr. Thorn had nothing to do with telling them how to stack the flour, but this matter was supervised by Mr. Humphries. Some of the witnesses testified that Mr. Thorn would not come into the building when they would bring a load of flour, but that Mr. Humphries, manager of the Kroger company, would give them directions as to stacking the flour. If the jury believed this, they had a right to find that Humphries was in control, directing not only the place where, but the manner in which the flour should be stacked.

It will be noticed from the testimony above that several witnesses testified that Humphries directed the negro boys in the stacking of the flour.

This court has approved instructions many times telling the jury that they are the sole and exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. The trial judge and jurors see the witnesses and hear their testimony, observe their demeanor, and this court has no opportunity to do this. That is one reason why the finding of facts by a jury is conclusive here. This court recently said:

"It is earnestly insisted by appellants that the court should have directed a verdict in their favor. As we have many times held in determining this question, we must view the evidence in the light most favorable to appellee, and if there is any substantial evidence to support the verdict, it will be sustained." *Missouri State Life Ins. Co.* v. *Holt,* 186 Ark. 672, 55 S. W. 2d 788; *Missouri Pac. Rd. Co.* v. *Harville,* 185 Ark. 47, 46 S. W. 2d 17; *Baltimore & O. Rd. Co.* v. *McGill Bros. Rice Mill,*

185 Ark. 108, 46 S. W. 2d 651; *Altman-Rodgers Co.* v. *Rogers,* 185 Ark. 561, 48 S. W. 2d 239; *Halbrook* v. *Williams,* 185 Ark. 885, 50 S. W. 2d 243; *Arkansas P. & L. Co.* v. *Connerly,* 185 Ark. 693, 49 S. W. 2d 387; *Chicago, R. I. & P. Ry. Co.* v. *Matthews,* 185 Ark. 724, 49 S. W. 2d 392.

The judges of this court have no opportunity to see the witness, observe his demeanor on the stand or his manner of testifying, and, therefore, could not judge of the credibility of the witness or the weight to be given his testimony as well as the trial judge and jurors, and for that reason we have uniformly held that if there is any substantial evidence to support the verdict of the jury, this court cannot set it aside. Even if we are of opinion that the verdict is against the preponderance of the evidence, and believe that if we had been on the jury we would have reached a different conclusion, still if there is any substantial evidence to support the jury's verdict, it must be upheld.

"The fact that the appellate court would have reached a different conclusion had the judges thereof sat on the jury, or that they are of the opinion that the verdict is against the preponderance of the evidence, will not warrant the setting aside of a verdict based on conflicting evidence." 4 C. J. 859, 860.

We said in the case of *Missouri & N. A. Ry. Co.* v. *Johnson,* 115 Ark. 448, 171 S. W. 478: "We will not reverse the judgment because of the insufficiency of the evidence, for as we view this evidence, it is not physically impossible that the appellee was injured as a result of stepping into an unblocked frog, although it is highly improbable that the injury was caused in that manner."

"It may be that it is improbable that the injury occurred in the instant case as stated by appellee, but it is not physically impossible.

"In determining whether there was sufficient evidence to submit the cause to the jury, we look at the evidence of the appellee alone. . . .

"The verdict of a jury cannot properly be disturbed on appeal merely because of its appearing to be against

the clear weight of the evidence, or because, if we were to pass upon the matter as seen in the printed record, we might find differently than the jury did. If the verdict has any credible evidence to support it, any which the jury could in reason have believed, leaving all mere conflicting evidence, evidence short of common knowledge, conceded or unquestionably established facts and physical situations, it is proof against attack upon appeal, and that must be applied so strictly, on account of the superior advantages of court and jury for weighing the evidence, that the judgment of the latter approved by the former is due to prevail, unless it appears so radically wrong as to have no reasonable probabilities in its favor after giving legitimate effect to the presumption in its favor and the makeweights reasonably presumed to have been rightly afforded below which do not appear, and could not be made to appear, of record." *Baldwin* v. *Wingfield,* 191 Ark. 129, 85 S. W. 2d 689; *Barlow* v. *Foster,* 149 Wis. 613, 136 N. W. 822.

"Under our system of jurisprudence it is the province of the jury to pass upon the facts. It is not only their privilege, but their right, to judge of the sufficiency of the evidence introduced, to establish any one or more facts in the case on trial. The credibility of the witnesses, the strength of their testimony, its tendency, and the proper weight to be given it, are matters peculiarly within their province. The law has constituted them the proper tribunal for the determination of such questions. To take from them this right is but usurping a power not given. . . . When there is a total defect of evidence as to any essential fact, or a spark, a 'scintilla,' as it is termed, the case should be withdrawn from the consideration of the jury." *Metropolitan Life Ins. Co.* v. *Gregory,* 188 Ark. 516, 67 S. W. 2d 602; *Cunningham* v. *Union Pac. Ry. Co.,* 4 Utah 206, 7 Pac. 795.

Of course, the mere fact that Humphries checked or counted the sacks of flour or that he told the negroes where to stack it, would not make the appellants liable, but the evidence in this case shows that stacking the flour in the manner in which Humphries directed was the cause

of the injury. As to whether Sam Mixson and other witnesses for appellee told the truth was a question for the jury, and settled by its verdict. If Mixson told the truth, and the jury had an opportunity to observe him on the witness stand, Humphries did direct him to stack it in a negligent manner, and Mixson said that but for that it would not have fallen.

It is next contended that the court erred in giving instruction No. 1 requested by the appellee. That is a long instruction, and the appellants made specific objections; first, because they say there was no evidence to submit to the jury the question of the agency or employment of Mixson or the other negroes. Their next objection to the instruction is that Mixson was at the time employed by Thorn, an independent contractor. What we have already said answers these two questions. Their next objection to this instruction is that there is not sufficient evidence to submit to the jury the question that C. A. Humphries was exercising direct control and supervision over the negroes at the time of the accident. They object further because, they say, there is no evidence to show what was the customary method of stacking flour, and no evidence to submit to the jury the question that it was not being stacked in the customary manner. There is substantial evidence showing the directing of Humphries and the stacking of it in accordance with his directions. If the customary manner was negligent, this would certainly not excuse the appellant, and Mixson's testimony answers these objections.

We have carefully considered instruction No. 1, together with objections of appellants, and find no error in the court's giving the instruction.

Their next contention is that the verdict is excessive. The testimony of Dr. Carruthers and other witnesses set out above shows the injury, the extent of it, and that it is permanent, and growing progressively worse. It is just as much the province of the jury to determine the extent of one's injuries, and the amount of damages, as it is to determine the question of liability. His injury, pain and suffering, are purely questions of

fact, and should be left to the jury to determine. What can the judges of this court know about the condition of the appellee or the credibility and weight of the evidence of the witnesses? We believe that there is substantial evidence to support the verdict, and to justify the amount of the damages awarded.

The authorities above cited on the question of liability are applicable here.

"While the discretion of the jury is very wide, it is not an arbitrary or unlimited discretion, but it must be exercised reasonably, intelligently, and in harmony with the testimony before them. The amount of damages to be awarded for breach of contract, or in actions for tort, is ordinarily a question for the jury; and this is particularly true in actions for personal injuries and other personal torts, especially where a recovery is sought for mental suffering." *Coca-Cola Bottling Co., of Ark.* v. *Cordell,* 189 Ark. 1132, 76 S. W. 2d 307.

The judgment is affirmed.

GRIFFIN SMITH, C. J., SMITH and McHANEY, JJ., dissent because they believe the judgment is excessive.