St. Louis-San Francisco Railway Company *v*. Cole.

Opinion delivered May 12, 1930.

*E. T. Miller, E. L. Westbrooke, Jr.,* and *E. L. West-brooke,* for appellant.

*Cunningham & Cunningham,* for appellee.

MEHAFFY, J. Joe B. Cole, the appellee, was the owner of a team of mules, wagon and harness. The mules were hitched to the wagon in front of the house of Mr. Jones, but were not hitched to anything to prevent them moving. The lines were tied to the wagon standard, and the team was left standing, no one about them. Mr. Jones had hitched them to the wagon and left them standing in front of the house, and they walked off, went to the railroad crossing, and were struck by a train, and the mules were killed, the wagon and harness damaged. After Jones had tied the lines in front of the wagon and left the mules unhitched, he walked towards the railroad track, and was on the track when the mules started towards the track. The railroad crossing where the mules were killed was about 170 steps from the front door of Mr. Jones' house, in front of which the mules were left.

There is some conflict in the testimony as to whether the mules in going from Jones' house to the railroad crossing were walking fast or slow, but all of the witnesses agree that they were walking. Some of appellant's witnesses say they were walking at a good fast walk, and appellee's witnesses testify that they were walking slow. The track was straight and unobstructed for more than a quarter of a mile from the crossing where the mules were killed, in the direction from which the train came.

The engineer, King, testified that he was the engineer on a passenger train of six steel coaches and locomotive, going south towards Memphis. That he struck the team of mules a short distance west of Hoxie, was running about sixty miles an hour. He also testified that he sounded the whistle at the whistling post for the crossing, following that with the station whistle, and that the whistle was sounded all the way until they were over the crossing. He said he turned on the bell ringer and the bell was ringing. That the fireman hollered at him, and he slipped the brakes over to the emergency, and then saw the heads of the mules as he struck them. The mules came on to the track from the left side and had never been in the view of the engineer. He testified that he had been an engineer since May 12, 1905; that he was looking ahead all the time. The front of the engine and boiler obstructed his view of the mules, and when the fireman hollered at him he put the brake into emergency. They were a short distance from the crossing, probably 100 feet when the fireman gave him notice. The brake valve is right at the engineer, and he struck the brake valve back into emergency, and about that time they hit the mules.

The fireman testified that he had had experience of 11 years, and, when they approached the crossing about 700 feet away, he saw a team coming on the side of the right-of-way line. They walked on, and he saw there was no driver in the wagon. When he discovered that

there was no driver, he hollered to the engineer, and the engineer applied the brakes in full force, but they struck the mules. The fireman testified that the engineer was blowing the whistle for the crossing, that the mules were getting into the inside of the right-of-way line fence before the fireman discovered them. He did not have any sight of them while they were off the right-of-way until they reached the fence; saw the first glimpse of their heads when they were coming into the right-of-way fence. From the right-of-way line to the center of the track is 50 feet.

Ernest Jones testified that there was nothing to obstruct the view of one on a locomotive approaching the crossing in the direction the train was going, from seeing a team when it comes into the right-of-way a quarter of a mile, but he said when the train was a quarter of a mile away the mules were not there. He did not think the train whistled, but would not be positive about it.

Bessie Holder testified that she was between the house and the railroad, and saw the train strike the mules, and did not hear any alarm. She said she did not know how many times she heard the train whistle, but she heard it after it hit the mules.

Nina Jones testified that she heard the whistle north of the trestle, but not south of it.

Ruby Cole, daughter of appellee, testified that the whistle blew before the train got to the trestle, but never before it got to the crossing, and the train did not whistle any more after the first time. She admitted, however, that she signed a statement, and that she herself wrote at the bottom of the statement, "I have read this, and it is true," and in that statement she admitted that she had said she heard the whistle sounded. It was the musical sounding whistle, and she did not know how many times it sounded.

Claudia Cole, another daughter of appellee, saw the train and said it did not whistle. She had also signed

a statement and had written at the bottom of it before she signed it, "I have read this, and it is true," and in that statement she said she did not think the whistle was sounded, but could not be positive; if it sounded, she did not hear it.

The only question for our consideration is whether the evidence is legally sufficient to sustain the verdict. There was a verdict for $250 in favor of appellee. It is the established doctrine of this State, under § 8562, C. & M. Digest, that where an injury is caused by the operation of a railway train a *prima facie* case of negligence is made against the company operating such train. When the evidence shows. that an injury was caused by the operation of a train, the presumption is that the company operating the train is guilty of negligence, and the burden is upon such company to prove that it was not guilty of negligence. *St. L. S. W. Ry. Co.* v. *Vaughan,* 180 Ark. 559, 21 S. W. (2d) 971.

The Supreme Court of the United States recently said, in construing a statute similar to the Arkansas statute: "The only legal effect of this inference is to cast upon the railway company the duty of producing some evidence to the contrary. When this is done, the inference is at an end, and the question of negligence is one for the jury upon all the evidence." *Western & A. R. R. Co.* v. *Henderson,* 279 U. S. 639, 49 S. Ct. 445.

After the introduction of evidence by the railroad company, as we have already said, the inference is at an end. It cannot be considered by the jury as evidence.

In construing the Mississippi statute, the Supreme Court of the United States said: "It did not * * * fail of due process of law because it creates a presumption of liability, since its operation is only to supply an inference of liability in the absence of other evidence contradicting such inference. The Mississippi statute created merely a temporary inference of fact that vanished upon the introduction of opposing evidence. * * * That of Georgia, as considered in this case, creates an inference

that is given effect of evidence to be weighed against opposing testimony, and is to prevail unless such testimony is found by the jury to preponderate. The presumption raised by § 2780 is unreasonable and arbitrary, and violates the due process clause in the 14th Amendment." *Western & A. R. R. Co. v. Henderson,* 279 U. S. 639, 49 S. Ct. 445.

Under the construction placed upon statutes like ours, the presumption of negligence is at an end when the railroad company introduces evidence to contradict it, and the presumption cannot be considered with the other evidence, because to do this would, as stated by the Supreme Court of the United States, be unreasonable and arbitrary, and would violate the due process clause of the 14th Amendment. Therefore, in determining whether the evidence in this case is legally sufficient to support the verdict, we cannot consider the presumption created by the statute, but must determine the question from the evidence introduced. The train was running about 60 miles an hour, the engineer and fireman were both keeping a lookout. It was impossible for the engineer to see the mules as they approached the track because they were on the left hand side of the track, and the engineer on the right-hand side. The fireman, however, was keeping a look-out, and saw the mules about the time they came on to the right-of-way, but at first there was nothing to indicate that there was any danger. The mules were walking, and, according to the testimony, the whistle was being sounded. The engineer and fireman testified that it was, and the witnesses for appellee did not say that it was not, but some of them say they did not hear it, but the engineer and fireman both testified that the bell was ringing at the time, and this is not disputed by any witness. The statute does not require that both the whistle and the bell shall be sounded, but it does require that one of them must be, and the undisputed proof shows that this statute was complied with. Section 8568A, C. & M. Digest.

When the fireman saw the team, as we have said, there was nothing to indicate that there was any danger. Persons operating passenger trains are not required to stop when they see teams near the right-of-way unless there is something to indicate that they are going on to the track. They have a right to assume of course that persons driving on the highway will exercise ordinary care, and the persons operating the trains are required to exercise just such care as persons of ordinary prudence would exercise under the circumstances. Whenever persons operating a train see persons or stock near the track, and there is anything to indicate that they did not know of the approaching train or that they are in a situation of peril or danger, it is then the duty of the persons operating the train to exercise care to avoid injury.

"The statute referred to imposes upon the railroad the duty to maintain a constant lookout, and charges it with the responsibility of having seen what would have been seen, had this lookout been kept, and imposes upon the carrier the degree of care it should have exercised had the lookout been kept and the traveler's peril thereby observed; and if, by keeping this lookout, the railroad company could and would have discovered the traveler's peril in time to avert the injury, it is liable if it fails to do so, notwithstanding the fact that the traveler's contributory negligence placed him in peril. But it does no more than this. The duty of the railroad to take precautions begins when it discovers, or should have discovered, the peril of the traveler. So here the railroad company should have kept the lookout, and is chargeable with such knowledge as it would have had, had the lookout been kept; but if the lookout had in fact been kept and appellee's presence near the track discovered, this would have imposed no duty on the railroad to stop the engine or to take other precautions until the peril of the traveler was discovered." *B., L. & A. S. R. Co.* v. *Gessell*, 158 Ark. 569, 250 S. W. 881; *Lane* v. *K. C. S. R. Co.*, 78 Ark. 236, 95 S. W. 460.

The jury could not arbitrarily disregard the testimony of the engineer and fireman. *St. L. I. M. & S. R. Co.* v. *Landers,* 67 Ark. 514, 55 S. W. 940.

"The public interest requires that trains be run on time and that railroads dispatch their business promptly." *Davis* v. *Porter,* 153 Ark. 375, 240 S. W. 1077.

In this case the evidence shows that both engineer and fireman were keeping a lookout, and that, as soon as the fireman discovered there was no driver, he notified the engineer, the engineer then did all he could to avoid striking the mules. The fact that the fireman saw the mules near the track imposed no duty on the railroad to stop the engine, or to take other precautions until the peril was discovered. Until the fireman discovered that there was no driver, he had a right to believe that the person in charge of the mules would act in response to the dictates of ordinary prudence. It appears from the evidence that there was a fence, and that the fireman did not see the mules until they passed this fence. Appellee contends that because the fireman said it was several seconds before the engineer understood him, that this was evidence of negligence, but we do not think this evidence indicates or tends to prove negligence. The trainmen did all they could after they discovered the peril, and they were not required to take any precautions until the peril was discovered, if they were keeping an efficient lookout, and the undisputed evidence shows that both the engineer and fireman were keeping a lookout. The evidence in this case is not legally sufficient to support the verdict. The judgment is therefore reversed, and the case dismissed.