MISSOURI PACIFIC RAILROAD COMPANY *v.* HANCOCK.

4-4882

Opinion delivered January 17, 1938.

*Thomas B. Pryor* and *W. L. Curtis,* for appellants.

*Partain & Agee,* for appellees.

GRIFFIN SMITH, C. J.   The only question presented by this appeal for consideration of the court is whether there was any substantial evidence to support a jury's verdicts, the effect of which was to find that appellant's negligence was greater than the contributory negligence of appellees, if any.

The accident which gave rise to the suits occurred in Paris on July 14, 1936, about 9:30 in the evening. The appellees were in a Model "A" Ford car. All were occupying the front seat. Bryant was driving, Hancock was in the middle, and Winkler was on the right. According to testimony on behalf of appellees, they were driving over an area traversed by several tracks, and ran into a coal car, injuring all of them.

Testimony of the appellees was the only evidence offered in support of their complaint. Hancock, first to take the witness stand, had lived in Paris six years. He thought there were five or six tracks across the highway where the accident occurred. Had lived down on the "other side" of the tracks for two years. A great deal of switching is done over the tracks. The company maintains scales used in weighing cars, "and they had just started switching, and they would just push the cars down enough from the scales across the street to make up a train, and then the 'extra' would come in and pull the train out." It had been customary for the company to keep a flagman at the crossing, and witness had been stopped by such flagman many times. "On the night in question we were driving on the crossing and we didn't see any light, so we kept driving and got nearly up to the third track, and I looked and saw the coal car blocking the road all at once, and I grabbed the emergency brake and he [Bryant, the driver] cut to the right to miss the car as it was coming on the crossing." The automobile ran into the car at a point "a pretty good piece toward the back end."

"Q. Did you look for a locomotive? A. Yes, sir, and you will hear one if they are switching. Q. Did you see any kind of a signal? A. No, sir. Q. Was any one giving you any kind of a signal as you approached that track?"

An objection by counsel for appellant that the question was leading was sustained.

The witness further testified that there was a car on the second track "before you got to this one; cars on both the right and left."

"Q. You have already stated that you were given no warning as you approached this crossing until this car shot out in front of you? A. No, sir."

The witness then testified that he was rendered unconscious and was carried to the hospital. "It injured my left eye, and these scars here on my head; and my back was wrenched and has hurt ever since, and I can't do any lifting without it bothering me. I lost about a month and a half from my work."

On cross-examination Hancock testified that he was watching the road all the time.

"Q. Didn't you see that car out there? A. Not until we hit it. Q. After you ran into it, didn't you observe the cars [a string of cars] out there? A. I was knocked out. Q. You don't know if the car was hooked on to other cars? A. No, sir. The first thing that I saw was the car just loomed up in front of us."

Further on in his testimony, Hancock, asked if there were other cars hooked on to the one they ran into, said that there couldn't have been—"I saw this one as it came out in front of us."

"Q. Who first discovered the car? A. We all saw it about the same time. Q. You were so close to the car that you couldn't stop? A. Yes, sir, and he [Bryant] turned the wheel around to try to get around the end of the car."

Witness was positive there were no other cars connected with the one they hit.

"Q. Have you ever been convicted for anything? A. Yes, sir, liquor."

Witness was on probation at the time the accident occurred.

After Baxter Bryant had testified to having sustained injuries as the result of "a collision with a coal car," and before he had stated that the coal car was in motion, he was asked: "Was there any light there to warn you of the *approach* of this car?" His answer was "No."

"Q. Did you see or hear anything to give you any warning of the approach of this train? A. No, sir.

"Now then, tell the jury the first warning that you had that there was a car movement of any kind. A. This street was open and ran on the crossing. There were several tracks there, and there were cars on both sides of the street. I was driving down through these cars on the crossing, and all at once a coal car came right in front of me, and I didn't know where it came from, and I couldn't avoid hitting it. I turned to the right to try to miss it, but I hit the back end of the car. There was only one car in that movement. No other cars were attached to it, and already across the pavement, but there were some already over there, and about the time I hit it, it hit another car. I don't know what they were doing with the cars. I was knocked over the steering wheel. I was bruised in my chest and on the back of my neck. Ever since then I have been sore, up until awhile back, and if I get in a certain 'creen' it hurts me. The automobile was practically ruined. That was the first time I had ever crossed that crossing, and there was no light there that night."

On cross-examination, the witness testified: "I was traveling about 20 miles an hour."

"Q. Did you keep up that pace until you discovered that car in front of you? A. I guess I did. I was traveling down the street and everything was clear, and after I saw the car—then I hit the car. When I hit the car I was going about ten miles an hour. I was within about 25 feet of the car when I first saw it, I believe. I hit about the wheels [near the west, or back end] of the car. Q. Did you pay any attention to the street lights there? A. They are all up and down the street, and were burning. Q. You say you didn't see any car to the left of the car that you hit? A. No, sir. Q. You didn't see any car on the right connected with that car? A. To the best of my memory, it was impossible to see both ends of the train there. Q. Didn't you make any observations after the accident to see how the accident happened? A. I didn't have much time to make any observations. I was trying to miss the car. Q. I am talking about after you hit it? A. I got out of that car

as fast as I could. I thought it was a train and I jumped out.''

The witness testified that the coal car moved ''four or five feet'' after he hit it. He also denied seeing or driving around another automobile just before hitting the coal car.

Appellee Winkler testified as follows: That he lived in Paris; is a farmer, but was working on relief in September, 1936. In approaching the crossing he did not see any watchman ''or a light or anything to give me warning that there was a car movement.'' Did not see a locomotive; did not hear the sound of a locomotive, and ''I never saw any light, although I was looking for one. The [automobile] car was driving up on the crossing, and when we got pretty close to this track, the first thing that I knew was when Ed [Hancock] reached for the brake. Bryant was trying to turn the car out of the way. I saw the coal car when they did. It came from the west going east, and was the first car. This car came out and came across the road in front of us, on the third track. My head was cut, and they took nine stitches in it—it knocked me out; I didn't know a thing until after I got to the hospital. I was laid up five weeks. I nearly bled to death, but it didn't bleed any after they sewed me up.''

On cross-examination the witness testified that the first thing that attracted his attention ''about anything being on the crossing'' was when Hancock got hold of the emergency brake.

''Q. You were right on the car then? A. Yes, sir.''

Witnesses called by appellant were: George Sisemore, of Paris, a photographer; Jesse Barnett, of Paris, who knew Hancock, but was not acquainted with either Bryant or Winkler, and was not connected with the railroad; Mrs. Jesse Barnett; L. K. Carpenter, of Paris, not connected with the railroad; E. Freeman, of Paris, not connected with the railroad; Harry Adkins, of Van Buren, car inspector for appellant; W. F. Tolsom, of Little Rock, Missouri Pacific employee; W. E. Pearsall, of North Little Rock, Missouri Pacific employee; D. T.

Holle, of Van Buren, Missouri Pacific conductor; George Vandergriff, of Van Buren, fireman for appellant company; W. C. Stevenson, of Paris, engineer for Missouri Pacific; and George Beattie, of Fort Smith, claim agent for the Missouri Pacific—each of whom contradicted the appellees.

Jesse Barnett, with his wife, had started across the series of tracks in question, and was stopped by a flagman because "a train was backing down there." Had been waiting a short time when the car in which appellees traveled came up. The flagman stopped witness after three or four cars had passed over. While witness was waiting after having been flagged, appellees drove up, and "in order to get around me they pulled around me on my right—that would be on the west side of the pavement." One flagman with a lantern was at the crossing; another caught the side of a car and moved on out with the train. Headlights on witness' car were shining during the time he waited [for the train to clear the track].

Mrs. Barnett testified that she and her husband were parked between the second and third tracks when the accident happened—in the middle of the highway. "We had started home from town and first went to the crossing above the station and couldn't cross there for the train, and we came back and went through the cotton gin yard to this crossing and a flagman stopped us. There was no car on the crossing when they flagged us, but one was almost on the crossing. Something like three, four, or five cars had gone over the crossing before they [appellees] ran into this car. You could see the reflection from our lights on the car as the car went over the crossing. The flagman had a lantern. He caught a car as it went over the crossing, and he rode away from there. When these people [appellees] came up I didn't see the flagman."

L. K. Carpenter was at Loding's store, 200 feet away. "I just saw the car coming down through there and saw Mr. Barnett sitting there in his car, and this car whipped around Mr. Barnett's car and hit the coal

car." Witness saw a switch movement being made at the time—"it was across there." Thinks that, in switching, they were cutting cars loose and moving them down the track. "They usually flag people there at night with lanterns; that is customary with the railroad company at that crossing."

E. Freeman testified that he was on the south side of the train when appellees hit it—on the side opposite that where the accident occurred. "As soon as the train stopped I hopped over there." Noticed several cars were in the string blocking the crossing; four or five of them had gotten across. They were all coupled together—they appeared to be coupled together, and were all rolling.

H. W. Adkins testified that there were fifteen cars in the cut, and that four or five had gone over the crossing when the accident occurred. The cars were coupled together, and had air in them. He saw the lights of the brakemen standing on the crossing. One brakeman rode away with the cars, but one was at the crossing all the time.

W. F. Tolsom was 150 feet from the crossing, following the engine so he could pass the signals. "We had come in from the field with seventeen cars of coal and were putting them on the main line. The train of cars was all coupled together, with air. I saw the lights from the crossing just as we started over. The train moved four or five feet after the accident. I noticed another car standing back there." Witness heard the collision, but did not see it.

W. E. Pearsall was "standing there flagging the crossing—watching them shove the cars down the scales track; and. also when they stopped I was to cut them off. The minute they pulled by the 'Y' I got off and flagged that crossing as they approached. Stopped someone there traveling south. There were seventeen cars in the string. Five cars had passed over the crossing when the accident occurred. I saw the car that was in the accident that hit us when it ran around the other car and ran into us. I had an electric lantern to flag

the crossing, and was using it. The cars were coupled. There had been another brakeman with me on that crossing, and he caught the rear car and moved out. He rode the car from the crossing to the 'Y' to the main track. Holle, conductor on the train, was not with me when I stopped Mr. and Mrs. Barnett—he was with me, but caught the rear car." The witness maintained that he stayed there all the time.

D. T. Holle testified: "At the time the accident occurred I was on the end of the cars that were shoved down the scales track. Got on the rear car at the crossing. Five cars had gone over the crossing when the accident occurred. Buck Pearsall went to this crossing with me when I got to it. He stayed at the crossing and cut the cars. We had 17 cars, all coupled together, and air on them." The witness recalled that one automobile had been flagged and stopped on the north side of the crossing while he was still there; Mr. and Mrs. Barnett were in that car. "At the time this movement was being made we were shoving the scales track for seventeen cars and a caboose on the scales track, and I was riding them to make the coupling. We shoved them down until we made the coupling. I left Pearsall at the crossing to cut the cars when they made the crossing."

George Vandergriff, fireman, was in the engine on the left side, when the accident occurred—the opposite side. Did not hear the collision. Knows that the whistle was blowing and that the bell was ringing.

"Q. How fast were you moving at the time? A. I couldn't say. It was very slow—three or four miles per hour. We were to pick up a coupling on a car. We had seventeen cars. We went out to the mine and made up this string and brought them in. They were all coupled together. I did not see the accident. I first learned of the accident when the engineer said somebody had hit us, and he got off."

W. C. Stevenson, engineer, testified: "The first information I had with reference to the accident, we were backing up over the crossing with a cut of cars, shoving them back, and the first thing I knew I saw a fellow

coming down the street and run into us. When I saw him coming on, nearly on the car without stopping, I applied the air. After applying air, the train moved about five feet. We had seventeen cars, and we had shoved about five over the crossing before the accident occurred. These cars were coupled, or connected together. I whistled the crossing signal, and the bell was ringing all the time. I was looking back for signals when I saw the accident.''

George Beattie, claim agent, identified photographs showing the scene of accident, and the damaged automobile.

When a jury has returned a verdict on conflicting testimony, and the testimony supporting such verdict is of a substantial nature, this court will not set it aside because the justices would have reached a different conclusion; nor will it be set aside on account of the number of witnesses testifying against the successful party, or on account of the character of the witnesses, unless they are wholly discredited; nor because the only testimony in favor of the successful plaintiff or defendant was that of the party or parties to the complaint, they being interested. These general principles have been often repeated.

''However improbable evidence may be, the jury is not justified in disregarding it.'' *National Benefit Life Insurance Company* v. *Pitts,* 180 Ark. 1146, 30 S. W. 2d 853.

''The 'preponderance of evidence,' and the 'greater weight of evidence' do not mean the greater number of witnesses, but evidence entitled to greater weight in respect to credibility.'' *Louisiana & Arkansas Ry. Co.* v. *Muldrow,* 181 Ark. 674, 27 S. W. 2d 516.

''Courts and juries are not compelled to blindly accept the statements of witnesses. In arriving at conclusions they are allowed to weigh the testimony and test the credibility of witnesses, under well defined rules, in the light of all the facts and circumstances in a particular case.'' *Louisiana Petroleum Corporation* v. *Oil Well Supply Co.,* 172 Ark. 386, 291 S. W. 1.

"Where testimony is admitted, it certainly becomes a question for the jury to determine whether the thing sought to be proved by such evidence is shown to be reasonable and probable, and is not merely speculative." *Benefit Association of Railway Employees* v. *Jacklin*, 173 Ark. 937, 294 S. W. 353.

"The weight of evidence and credibility of witnesses is solely within the jury's province, and the jury may reconcile conflicts in the testimony of a witness, accepting that portion which they believe to be true and rejecting the remainder." *Gibson Oil Co.* v. *Bush*, 175 Ark. 944, 1 S. W. 2d 88.

"In an action against a railroad operating a train which struck mules at a crossing, the jury could not arbitrarily disregard the testimony of the engineer and fireman to the effect that they were keeping an efficient lookout and did all they could to avoid injury after the peril was discovered." *St. Louis-San Francisco Ry. Co.* v. *Cole*, 181 Ark. 780, 27 S. W. 2d 992.

Even though juries are the "sole judges," etc., their verdicts, in order to be sustained, must be based upon *substantial* evidence, and while as a general rule any *reasonable* evidence will be regarded as substantial, yet "Where personal testimony is at variance with physical facts, and such repugnance is material, and is also self-evident, improbable conclusions drawn in favor of a party litigant through the sanction of a jury's verdict will not, on appeal, be looked upon as inviolate if in conflict with recognized elements of time, mathematics, and the accepted laws of physics." *Magnolia Petroleum Co.* v. *Saunders*, 193 Ark. 1080, 104 S. W. 2d 1062. See, also, *St. Louis S. W. Ry. Co.* v. *Ellenwood*, 123 Ark. 428, 185 S. W. 768.

"As this witness was party plaintiff, it cannot be said that his evidence must be treated as undisputed." *Nelson* v. *Missouri Pacific Railroad Co.*, 172 Ark. 1053, 292 S. W. 120; *Skillern* v. *Baker*, 82 Ark. 86, 100 S. W. 764, 118 Am. St. Rep. 52, 12 Ann. Cas. 243.

"According to the testimony introduced by appellants, which must be regarded as disputed on account of

the interest of the witnesses testifying in the result, and on account of contradictory circumstances, an oral contract was entered into." *Walker* v. *Eller,* 178 Ark. 183, 10 S. W. 2d 14; *Metcalf* v. *Jelks,* 177 Ark. 1023, 8 S. W. 2d 462; *Blankenship* v. *Modglin,* 177 Ark. 388, 6 S. W. 2d 531; *Burke* v. *International Life Ins. Co.,* 179 Ark. 651, 17 S. W.. 2d 314; *Bridges* v. *Shapleigh Hdw. Co.,* 186 Ark. 993, 57 S. W. 2d 405; *Davis* v. *Oaks,* 187 Ark. 501, 60 S. W. 2d 922; *Elmore* v. *Bishop,* 184 Ark. 243, 42 S. W. 2d 399. However, "Improbability alone is not sufficient ground for holding a fact not proved, where it is supported by competent and apparently credible testimony." *Producers' Sand & Gravel Company* v. *Patterson,* 188 Ark. 50, 64 S. W. 2d 320.

In the light of these decisions, it is essential that we examine testimony of the three plaintiffs, keeping in mind the cardinal principle that if there is substantial evidence to support the verdict, the judgments should be affirmed by this court,

The accident occurred on what is now known as highway No. 22, which passes through the town or city of Paris. The state highway, of which this is a continuation, is 18 feet wide. There are suggestions in the testimony that the highway is a part of a city street, widened as to that portion transversing the railways, but these inferences cannot be accepted as evidence, and the highway crossing and approaches must be treated as being "a wide street."

Appellees were driving from the north in a southerly direction. Of the series of tracks to which reference has been made, it seems clear that appellee had crossed two, and were approaching the third, beyond which there was at least one more track. Admittedly the train or car movement was from west to east, virtually at right angle to the direction traveled by appellee. There is satisfactory proof that inactive cars were on some of the tracks on either side of the crossing.

The act of negligence alleged by appellees is that the car with which they collided was being "shunted," or "shoved" over the crossing; that it was not connected

with other cars, or with an engine; that when they were within about 25 feet of the crossing they suddenly saw a coal car "loom up" in front of them; that it came from the west, which would be on appellees' right; that they were looking for danger signals and saw none—in fact, there were none, if their testimony is to be accepted; that there was no flagman at the crossing, etc. The driver of the car says that he was unfamiliar with the crossing, but one of appellees had often used it. They claim not to have seen the parked automobile occupied by Mr. and Mrs. Jesse Barnett. At least one of the appellees testified that they did not drive to the right of the Barnett car—that in reality no such car was there. They did not, however, deny being on the *west* side of the paving, as testified to by Jessie Barnett.

On direct examination most of the testimony given by appellees with respect to notice was of a negative nature—that is, they did not see nor hear certain things. As the examination proceeded they became affirmative. Many of the answers are responsive to the suggestive nature of questions. As an example, Hancock was asked: "You have already stated that you were given no warning as you approached this crossing until this car shot out in front of you?" Answer, "No, sir." Whether the witness intended to say that he was given no warning, or that he had not already made such a statement, is uncertain. However, up to that time he had not testified that a car "shot out" in front of him. This appellee was rendered unconscious by the impact. On cross-examination he stated that he did not see the coal car until "about the time we hit it." He later asserted that he "saw this car as it came out in front of us"—that they all saw it about the same time. This witness also said that they were on a wide street. Expressed differently, the witness said, "The first thing I saw was the car just loomed up in front of us." Then this statement: "I saw this one as it came out in front of us."

The appellee Bryant's version was: "I was driving down through these cars on the crossing, and all at once a coal car came right in front of me. I don't know where

it came from." In explaining that the car he hit was not connected with others, Bryant [presumably referring to that portion of the track on which the movement occurred] said: "There were some already over there, and about the time I hit it, it hit another car." There is this further statement: "To the best of my memory, it was impossible to see both ends of that train. I thought it was a train [after the accident] and I jumped out."

Appellee Winkler testified that "The first thing I knew was when Ed reached for the brake. I saw the coal car when he did." He later said that they were "right on the car then."

Although there is a denial on behalf of appellees that they saw the Jesse Barnett car at the crossing, there is convincing evidence that it was there. The jury may have disbelieved this, and it had a right to do so, in view of conflicting testimony, but since there was no special finding of fact on the several disputed points, and since a finding to this effect was not essential to a recovery if other substantial evidence appeared in the record, it cannot be said that the Barnetts and those who supported them have misstated the fact, or that the jury so found. While Hancock said they did not drive around the Barnett car, he merely said he did not see it—"I wasn't doing the driving, but I was looking ahead. We all saw the coal car about the same time."

The only reference made by Bryant to the Barnett car was that he "didn't see it either before or after the accident." He did not deny that he drove around it.

Winkler testified that when his attention was attracted to the danger, they were "right on the car." That was when Hancock reached for the emergency.

It is in evidence by the testimony of Bryant that the coal car moved only four or five feet after appellees hit it.

The engineer testified that the speed of the train in backing was three or four miles an hour, and that after the accident he moved about five feet. There is virtual harmony, therefore, between the statements of this appellee and the engineer as to the distance the coal car moved subsequent to the impact. Although not disputed

by affirmative personal testimony, the estimate of the rate of speed at which the train was proceeding, as testified to by the engineer, cannot be accepted as undisputed, he being an employee of appellant company, and indirectly interested. At least he was not wholly disinterested.

If, in fact, appellees were traveling at a rate of speed of 20 miles per hour, as they testified, and discovered the peril "as it loomed up before them" when they were 25 feet from the danger point, they would have contacted the coal car in less than one second unless their speed were checked. One of the appellees estimated that at the time of collision they were traveling at ten miles per hour.

At 20 miles per hour they would have traveled 29 1/3 feet in one second. This does not take into account the period of reaction, which is said to be ¾ of a second for the average man. Bashfield's Cyclopedia of Automobile Law and Practice, Vol. 9, p. 539.

Obviously, it was impossible for appellees, placed as they were when the danger became apparent, to have avoided striking the car.

The controlling question to be determined is, Were appellees negligent in placing themselves in the position of danger? If this question is answered affirmatively, can it then be said as a matter of law that their negligence was greater than that of appellant, if it should be conceded that appellant was negligent?

Clearly, the jury could not have returned its verdicts without finding that, in spite of all testimony to the contrary, the coal car struck by appellees was disconnected from others; that it was being shunted over the crossing, and that there were no ample warnings to appellees. In short, the jury accepted appellees' version of the transaction with respect to the immediate circumstances. This it had a right to do if the physical facts do not destroy the substantial nature of the testimony upon which the verdict was based, and if it did not arbitrarily disregard substantial testimony of disinterested witnesses who were not disputed.

If, as the appellee Hancock says, he looked up and "saw the coal car blocking the road all at once," then certainly a considerable part of the car was on the crossing, immediately in front of appellees. Taking the evidence as a whole, the point of impact appears to have been near the east end of the coal car, near the rear trucks. The train, traveling four miles per hour, would have moved 5.86 feet between the time appellees say they discovered their peril, and the time of impact. All of the appellees agree that Bryant, the driver, turned his car to the right. If this were done to any appreciable extent, the point of impact would have been farther west—nearer the front of the car—than if no turn had been made.

Appellees, then, are in the attitude of having testified that they didn't see the coal car until they were on it; that they discovered it at a distance of 25 feet; that it suddenly loomed up in front of them, blocking the crossing; that it was a single car; that "you couldn't see both ends of that train;" that after the impact the car moved only four or five feet; that about the time they struck the coal car the coal car pushed into another coal car on the east side of the highway—and so on.

It was physically impossible for the coal car to have bumped or eased into the car referred to as having been spotted on the east side of the crossing—that is, it was impossible for this to have occurred "about" concurrently with the impact. The explanation supplies apparent substantiation for appellees' contention that the car was not connected with four or five others which it was claimed by appellant had already passed over the crossing, but it places appellees on the wrong side of the highway.

It was impossible for the jury, or any jury, to have harmonized the discrepancies by eliminating impossibilities, and then to have had remaining sufficient evidence of a substantial nature upon which to predicate the verdicts.

The judgments are, therefore, reversed, and the causes dismissed.

HUMPHREYS and MEHAFFY, J.J., dissent.

HUMPHREYS, J. (dissenting). The testimony of the witnesses introduced by appellees as well as those introduced by appellant are set out rather fully in the majority opinion in this case, so it is unnecessary to again set out the testimony in this dissenting opinion. The testimony is conflicting on the issue of liability of appellant and also upon the issue of whether appellees were guilty of contributory negligence equal to or greater than that of appellant. The cause was submitted to the jury under correct instructions upon both issues with the result that each appellee obtained a reasonable amount for the damages he sustained growing out of the collision. These righteous judgments have been reversed and appellees' causes of action dismissed by a majority of the court in violation of the well-established rule of this court that the court will not disturb the verdict of the jury where the evidence as to liability is conflicting. This court has many times said that we look at the evidence in the most favorable light to appellee alone, and if there is any substantial evidence to support the verdict it will be sustained. *Humphries and Kroger Grocery & Baking Co.* v. *Kendall, ante* p. 45, 111 S. W. 2d 492; *Missouri State Life Ins. Co.* v. *Holt,* 186 Ark. 672, 55 S. W. 2d 788; *Missouri P. Rd. Co.* v. *Harville,* 185 Ark. 47, 46 S. W. 2d 17; *Baltimore & O. Rd. Co.* v. *McGill Bros. Rice Mill,* 185 Ark. 108, 46 S. W. 2d 651; *Altman-Rodgers Co.* v. *Rogers,* 185 Ark. 561, 48 S. W. 2d 239; *Halbrook* v. *Williams,* 185 Ark. 885, 50 S. W. 2d 243; *Arkansas P. & L. Co.* v. *Connely,* 185 Ark. 693, 49 S. W. 2d 387; *Chicago, R. I. & P. Ry. Co.* v. *Matthews,* 185 Ark. 724, 49 S. W. 2d 392.

It seems to me that no one can read the evidence in behalf of appellees set out in the majority opinion without reaching the conclusion that appellees' evidence is substantial and shows that appellant was negligent in shunting or running a car across the street without warning immediately in front of and so close to appellees' automobile that it was impossible for appellees to stop, although traveling at a reasonable rate of speed.

The rule is well settled that where issues depend on the credibility of witnesses and the effect of the weight

of evidence that a jury and not the court must determine such issues, and this is true, although the court might have reached a different conclusion had the judges of the court sat on the jury, and although they are of opinion that the verdict is against the preponderance of the evidence. 4 C. J. 859, 860; *Missouri & N. A. Ry. Co.* v. *Johnson,* 115 Ark. 448, 171 S. W. 478; *Baldwin* v. *Wingfield,* 191 Ark. 129, 85 S. W. 2d 689; *Metropolitan Life Ins. Co.* v. *Gregory,* 188 Ark. 516, 67 S. W. 2d 602; *Cunningham* v. *Union Pac. Ry.,* 4 Utah 206, 7 Pac. 795; *Barlow* v. *Foster,* 149 Wis. 613, 136 N. W. 822; *Mathis* v. *Magers,* 191 Ark. 373, 86 S. W. 2d 171; *Smith* v. *Arkansas P. & L. Co.,* 191 Ark. 389, 86 S. W. 2d 411.

The trend of the majority opinion indicates to my mind that the judges making the opinion assumed to act as jurors instead of abiding by the verdicts of the jury in the cases, which are supported by substantial evidence. In my humble judgment the majority of my associates have invaded the exclusive province of the jury in the instant case without rhyme or reason. If verdicts of juries can be set aside by the Supreme Court where the verdicts are supported by substantial evidence, there is no further need of the jury system in this state. I think the majority opinion of this case has the effect of rendering jury verdicts nugatory.

Mr. Justice MEHAFFY joins me in this dissenting opinion.