St. Louis-San Francisco Railway Company, et al. *v.* Robinson.

4-5197                                    120 S. W. 2d 567.

Opinion delivered October 24, 1938.

*J. W. Jamison* and *Warner & Warner*, for appellants.
*Partain & Agee,* for appellee.

Smith, J. This is an appeal from a verdict and judgment awarding appellee damages for a personal injury resulting from the striking of his left hand by one of appellant's locomotive engines. The cause was tried upon the sole issue that the railway company had failed to keep the efficient lookout required by the statute, which, if it had been kept, would have averted appellee's injury. No other question of negligence was submitted to the jury.

The testimony was to the following effect. Appellee, an elderly man, was in Van Buren on the 18th day of February, 1937, and wished to return to his home at Schaberg, a station on appellant's railroad north of Van Buren. He lacked sufficient funds to pay the railroad fare the entire distance from Van Buren to Schaberg, so he started walking on the railroad tracks from Van Buren to Schaberg, with the view of boarding the train at Meadows, an intervening stop. He was under the impression that Meadows, which is about six miles north of Van Buren, was a flag stop for the train he expected to take to Schaberg, and while it appears that Meadows was not a flag station for the train appellee proposed to take, it is insisted by appellee that this fact is unimportant, a view in which we concur.

The train in question was due to pass Meadows at 6:32 p. m., but did not pass that place until 6:42, making the train ten minutes late. Appellant insists that the testimony does not show that the train was late, and that in any event it was a question of fact whether this was true. The train was delayed at the Missouri Pacific interlocker for ten minutes at Van Buren, and the lost time had not been made up when the train passed Meadows, On account of numerous curves the train ran under re-

strictions between Van Buren and Meadows, and had not been running a sufficient time or distance in which to make up the lost time before reaching Meadows.

The complaint alleged that appellant arrived at Meadows about 6:45 p. m., and there was no modification of this allegation, nor did appellant offer any testimony to contradict it. We, therefore, treat the fact as undisputed that the train passed Meadows about 6:42 p. m., and the engineer testified that it was then traveling at a speed of about 35 miles per hour.

The testimony is conflicting as to whether it was then dark. Appellee arrived at the home of a Mr. Isom, where he stopped, and the testimony of Isom and his wife is to the effect that he left their place about 5:30 p. m.

Appellee had left Van Buren at about 2 p. m., and was evidently walking very leisurely. It was about a mile and a half from the Isom home to Meadows. The Isoms testified that it was not then dark, nor was it dark when the train passed Meadows. Appellee testified that it was not dark when the train passed Meadows, and, when asked by his attorney, "Do you know how far you could have been seen on the track by any one on the engine?" answered: "A hundred yards."

W. C. Hickman, the Government meteorologist at Fort Smith, a city about eleven miles from Meadows, testified that February 18th was a cloudy day, and that the sun set at 6:04 p. m., and that darkness came about thirty minutes later. As an astronomical fact visibility must have been very low, if it existed at all, without the aid of the headlight of the train.

Appellee was asked if he knew the condition of the track before you get to Meadows for some distance as to its being straight, and he answered, "Comparatively straight." There was no testimony to the effect that the track was straight, appellee's testimony being that it was "Comparatively straight."

The engineer testified that ". . . A second curve is through a high rock cut to the right, and then a left curve, which continues up to the north end of the station platform at Meadows. The last curve is approximately 1,400 feet in length; it is an excessive curve, on which

speed is restricted. There is no station at Meadows, only a gravel platform on the west side of the track near the end of the curve; no depot or shed of any kind, and the north end of the curve is about even with the north end of the station platform.''

The engineer and the fireman both testified that they were in their respective and proper places on the engine. The engineer further testified that the headlight was burning as the train approached Meadows, but as they were taking a left-hand curve the headlight cut across the right-of-way fence; the rays did not go down the track, but were thrown out on the right-of-way, and as you move around the curve the headlight will not line up with the track until after the locomotive has passed the platform. The engineer did not see any one as the train approached Meadows. The fireman's testimony was to the same effect, and he saw no one on the track.

Appellee's version of the manner in which he was injured is as follows. After leaving the Isom home he walked on to Meadows, and the sun "Was about that high (indicating about eight inches on his walking cane). I walked back and forth there, and a cloud came up over the sun and hid it from me, and I walked back and forth there and waited for some bit, and finally I saw the light of the train back behind Frog Bayou, south of me, and I waited some longer, until it was within 300 yards, and I got on the track and flagged the train with a paper in this hand. I waited until it got about 150 yards to flag it. I can't see or hear very good. The train was close enough that I thought I could stop it with my flag, and when I did see this train was as close as it was I saw that I had only time enough to get off I brought this hand around and the engine struck me, and it deadened my arm to my shoulder. . . .''

It was shown that the operating rules of the railway company were to stop any train when flagged, whether at a flag station or elsewhere, not to receive passengers, but as a safety measure.

When this testimony has been viewed in the light most favorable to appellee, as it must be, in determining its legal sufficiency to support the verdict in his favor,

we conclude that a case was not made for the jury, and we reach this conclusion for the reason that it appears that appellee's negligence was the sole proximate cause of his injury. No response was made to appellee's signal for the train to stop by whistle or otherwise. Indeed, he testified that the train "Seemed to come harder."

Had the operatives of the train discovered appellee's presence upon the track—and there is no testimony to support a finding that they did—it would not have appeared to them that appellee was unaware of the danger through the approach of the train. He was not oblivious of that fact, and it would not have so appeared had he been seen. On the contrary, he was fully apprised of the approach of the train, and there could have been no reason for believing that he was about to immolate himself. Appellee testified that his sight was not good and that his hearing was bad, but the fullest possession of these faculties could have conveyed no information to him which he did not have. He had just walked six miles, and there appears to have been no reason why he could not have walked about six feet more to safety. Indeed, he had reached a place of safety but for the fact that he threw his hand back, evidently still trying to flag the train.

This case is unlike numerous cases cited in the briefs where a person had gone upon a railroad track without reason to apprehend danger and had been injured. Appellee's danger was fully apparent to him, and does not appear to have been known to any other person, and he did nothing to extricate himself from danger until it was too late. Under these circumstances his own negligence was the sole proximate cause of his injury.

The instant case is like that of *Tyler v. St. Louis, I. M. & So. Ry. Co.*, 130 Ark. 583, 198 S. W. 128, in which case the headnote reads as follows: "A railroad company will not be liable for the killing of a section hand, who was struck by a moving train, although it did not sound any warning of its approach, where all of the section hands with whom deceased was working, saw the approaching train, and the evidence showed that deceased also saw it, but neglected to step off the track."

This holding was reaffirmed in the case of *Chicago, R. I. & P. Ry. Co.* v. *Elzen,* 132 Ark. 431, 200 S. W. 1000, but the latter case was distinguished from the former, for the reason, there stated, that "It can not be said in the instant case, as was said in the cases of *St. Louis & San Francisco Rd. Co.* v. *Ferrell,* 84 Ark. 270, 105 S. W. 263, and *Tyler, Admx.,* v. *St. Louis, I. M. & S. R. Co.,* 130 Ark. 583, 198 S. W. 128, that the injured parties knew the trains were approaching and for that reason were cognizant of the danger." Here, as the undisputed testimony shows, appellee was fully cognizant of his danger.

In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Wilkerson,* 46 Ark. 513, it was said: "If the employees of a railroad company in charge of its train see a man walking upon its track at a distance ahead sufficient to enable him to get out of the way before the train reaches him, and are not aware that he is deaf or insane, or from some other cause insensible of the danger, or unable to get out of the way, they have a right to rely on human experience and to presume that he will act upon the principles of common sense and the motives of self-preservation common to mankind in general, and will get out of the way, and to go on without checking the speed of the train until they see he is not likely to get out of the way, when it would become their duty to give extra alarm by bell or whistle, and if that is not heeded, and it becomes apparent that he will not get out of the way, then, as a last resort, to check its speed, or stop the train, if possible, in time to avoid disaster. If, however, the man seen upon the track is known to be, or from his appearance, gives them good reason to believe that he is insane or badly intoxicated, or otherwise insensible of danger, or unable to avoid it, they have no right to presume that he will get out of the way, but should act upon the hypothesis that he might not or would not, and should use a proper degree of care to avoid injuring or killing him. Failing in this, the railroad company would be responsible for damages, if, by the use of such care, after becoming aware of his negligence, they could have avoided injuring him."

See, also, *St. Louis, I. M. & So. Ry. Co.* v. *Lawrence,* 106 Ark. 32, 152 S. W. 1002; *Chicago, R. I. & P. Ry. Co.* v. *Jones,* 124 Ark. 523, 187 S. W. 436; *Blytheville, L. & A. S. Rd. Co.* v. *Gessell,* 158 Ark. 569, 250 S. W. 881; *Jemell* v. *St. Louis S. W. Ry. Co.,* 178 Ark. 578, 11 S. W. 2d 449; *St. Louis-S. F. Ry. Co.* v. *Cole,* 181 Ark. 780, 27 S. W. 2d 992.

It follows from our finding that, since appellee's own negligence was the sole proximate cause of his injury, the judgment must be reversed, and, as the case appears to have been fully developed, it will be dismissed, and it is so ordered.

HUMPHREYS and MEHAFFY, J.J., dissent.