[Civ. No. 18937.   Second Dist., Div. One.   Aug. 11, 1952.]

Estate of IDA TEED, Deceased.   JAMES HOUGH et al., Respondents, v. HELEN HOUGH et al., Appellants.

Nixon A Lange, Cosgrove, Cramer, Diether & Rindge, John .N. Cramer and Jesse R. O'Malley for Appellants.

M. Lewis Lehman and Dockweiler & Dockweiler for Re- ·spondents.

DORAN, J.—The judgment herein refused probate to a will of the decedent, Ida Teed, executed on January 25, 1949, ·on the ground of mental incompetency. The decedent, a

maiden lady aged about 93 years, died on January 31, 1949. The trial court found that there was no undue influence and no fraud. The appellant Helen Hough is a grandniece of Miss Teeed; appellant Mabel Croy is a niece; appellant Childrens Hospital is a beneficiary under the will of January 25, 1949. Contestants and respondents James Hough and Edith Pazdernick, the decedent's nephew and neice, claimed as beneficiaries under a previous will dated October 15, 1948.

Appellants' contention is that the record discloses no substantial evidence "to show that Miss Teed had a mental sickness of such a degree that it incapacitated her from making a valid will." In regard to mental competency, it is urged that the trial court did not follow principles of law repeatedly laid down by the courts of this state, and that the "uncontroverted evidence affirmatively proves the competency of the testatrix on January 25, 1949." Conversely, the respondents assert that there is substantial evidence in support of the findings.

It appears from the record that Ida Teed, a Columbia graduate, was a retired school teacher and had been an art instructor in the New York and Los Angeles public school systems. In August of 1948, decedent was admitted to Good Samaritan Hospital in Los Angeles, then being acutely ill from a stomach hemorrhage. According to Dr. Urabec, decedent's physician, Miss Teed's condition improved after September, 1948. Likewise, an orthopedic specialist, Dr. Chappel, testified to decedent's improvement to such an extent that the patient was able to walk. On November 20, 1948, Miss Teed was discharged from the Good Samaritan Hospital and entered Longwood Manor Sanitarium where death occurred on January 31, 1949.

The respondents rely upon the principles enunciated in *Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384], as follows: "the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . It is an elementary principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is *any substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (Respondents' italics.) It is appellants' contention that the "six items of evidence which they (respondents) contend constitute substantial evidence that Miss Teed was incompetent at the time she exe-

cuted the will," do not meet the requirement of "substantial" evidence, within the meaning of the above rule.

The items relied upon by respondents as "substantial" evidence of Miss Teed's mental incompetency, comprise (1), the testimony of Jane Morgan, an acquaintance; (2) decedent's hospital chart; (3) medical testimony of Dr. J. M. Lacey; (4) testimony in response to a hypothetical question propounded to Dr. Victor Parkin, a psychiatrist; (5) previous wills executed and unexecuted by the decedent; (6) "failure of Ida Teed to know and comprehend the nature and extent of her property on January 25, 1949." A résumé of this evidence is essential to an understanding of the case. Unless the sum total of these items meets the above requirement, it must be assumed that the trial court's conclusion was wrong, both in fact and in law.

Jane Morgan testified to having known the decedent for some 18 years, visting Miss Teed periodically, the last conversation being at the sanitarium on January 20, 1949; that the witness found Miss Teed "failing rapidly"; that "she would talk very fast and her breath was very short, and I was fearful she might have a heart attack, so I asked her not to talk. . . . She seemed very excited and she was trying to tell me. something but I couldn't understand her." On cross-examination it was brought out that decedent had "difficulty in enunciating," but the witness thought that "if she knew what she was saying I could have got a drift of what she was trying to tell me regardless of whether she was enunciating clearly or not." When asked as to "the soundness or unsoundness of the mind of Miss Teed," the witness replied, "Well, my opinion was her mind was affected. Q. That she was of unsound mind? A. Unsoundly, yes." The witness did not discuss decedent's property or relatives, and had "no information with respect to her property or with respect to her relatives."

Decedent's hospital chart for January 24, 25 and 26, 1949, is the second item relied on as affording substantial evidence of mental incompetency. The notations for January 24, merely disclose that Miss Teed complained of various pains, was "Up in chair while eating" at 1:30, and shortly thereafter was "Reading paper"; pulse was "regular" and "unchanged," and respiration "normal." On January 25, the date when the will in question was executed, the patient

was "very nervous at 7 a. m.; after eating breakfast complained of tightness in chest and exhaustion, "wants to read but goes to sleep." At 4 p. m. the patient was "more comfortable—reading. Dr. Urabec here. Ate well—visiting nurse while eating." At 6 p. m., "patient appears improved this p. m." According to the chart, "Mr. Olson & Mr. Martin" (attorneys) were there after decedent finished lunch at 1 p. m., at which time, according to the attorneys' testimony, the will was executed after Miss Teed had read and discussed the will, "expressed her desires," and had remarked, "This Will will certainly make my relatives mad." The chart indicates that on January 26, the patient was complaining, uncomfortable and nervous, and had "a poor day." The chart contains no notations concerning Miss Teed's mental condition.

According to respondents' brief, "The testimony of Dr. J. M. Lacey definitely shows that decedent was of unsound mind January 25, 1949." The witness, a physician of 25 years' experience, specializing in "internal medicine diagnosing," with six months' experience in a psychiatric hospital, first met Miss Teed two years before death; had seen decedent professionally on two occasions in September, 1948, at Good Samaritan Hospital, spending a total of approximately two or three hours with the patient. Dr. Lacey gave the patient's history as including gastrointestinal hemorrhage prior to entering the hospital and a stroke of paralysis about September 1, 1948, with a high degree of arteriosclerosis. Dr. Lacey stated that Miss Teed "seemed to be very much of a crotchety old lady. She was 93 years old, and nothing would please her," and then expressed an opinion "that anyone with a history that she had . . . never does recover their mental equilibrium, so that their judgment is worth anything." With this basis, the physician concluded that when the will was executed, Miss Teed "was of unsound mind."

The fourth item of evidence alleged to constitute substantial proof of Miss Teed's incompetency is the testimony of Dr. Victor Parkin, a psychiatrist, who had never seen the patient. In response to a hypothetical question, the witness expressed an opinion that Miss Teed "was so far mentally enfeebled as to be of unsound mind." On cross-examination, in answer to the question, "And to make a sound psychiatric judgment of an individual some personal observation of that individual should be made . . . ?" the witness replied, "It

is always desirable to form your own opinion from your observations and examination.

Dr. Parkin was read a statement written by decedent on December 13, 1948, saying, "I am going to re-read Toynbee. In fact I have to read it several times to get the most out of it . Toynbee's or rather, the inferences from his book, are just what today thoughtful people are fearing. . . . I just opened Churchill's book you just sent me, and there is the same idea—a warning that our present civilization is in peril. That's what I get from Toynbee. It is not a thought to raise one's spirits." In answer to the question, "Would you state the author of that statement was of unsound mind, Doctor," the witness responded, "It doesn't sound like it to me."

Former wills and proposed wills of the decedent, "in sharp contrast" to the will in question, make up the fifth proposed item. In this connection respondents refer to *Estate of Mullen,* 8 Cal.App.2d 684, 686 [47 P.2d 746] where it is held that "A previously executed testamentary writing, conflicting with the propounded instrument, executed voluntarily and while decedent had recognized mental capacity, is an evidentiary fact from which undue influence or unsoundness of mind at the time of the later writing might be inferred, there being no explanatory facts." Appellants have commented on the fact that "The case is not in point for . . . in the case at bar there was a very great deal of evidence introduced as to why Miss Teed changed her will and made a bequest to the Childrens Hospital. . . ."

Respondents' sixth and last "item of substantial evidence," claimed to support the trial court's finding of incompetence, is "the failure of Ida Teed to know and comprehend the nature and extent of her property on January 25, 1949." According to appellants' brief, "The argument appears to be this, that since Miss Teed used a layman's words 'personal property' when she meant 'personal effects' this is substantial evidence that Miss Teed was incompetent on the day she executed the will in question. Merely to state the proposition is to answer it. Proponents' argument is addressed to the construction of the will, not to the competency of the testatrix."

Since, according to the well established rule as expressed in *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384], hereinbefore mentioned, "the power of the appellate court begins and ends with a determination of whether there is any *sub-*

644

*stantial* evidence to support the conclusion'' that the testatrix was of unsound mind at the time of executing the will in question, it becomes necessary to consider the meaning of the italicized word "substantial."

Webster's International Dictionary defines the word as follows: ''Consisting of, pertaining to, of the nature of or being, substance, existing as a substance; material.'' Its meaning is further defined as ''not seeming or imaginary, not illusive, real, true; important, essential, material, having good substance; strong, stout, solid, firm.'' The word means ''considerable in amount, value or the like; firmly established, solidly based.'' Synonyms are ''tangible, bodily, corporeal, actual, sturdy, stable.''

''Substantial evidence,'' according to Words and Phrases, Fifth Series, page 564, where many definitions are collected, is evidence ''which, if true, has probative force on the issues.'' It is more than ''a mere scintilla,'' and the term means ''such relevant evidence as a reasonable man might accept as adequate to support a conclusion,'' citing *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U.S. 197 [59 S.Ct. 206, 83 L.Ed 126]. To preclude a reviewing court from disturbing a verdict, it is essential that the supporting evidence be ''such as will convince reasonable men who will not reasonably differ as to whether evidence establishes plaintiff's case,'' quoting from *Morton* v. *Mooney,* 97 Mont. 1 [33 P.2d 262]. And as said in *Missouri Pac. R. Co.* v. *Hancock,* 195 Ark. 414 [113 S.W.2d 489], ''improbable conclusions drawn in favor of a party litigant through the sanction of a jury's verdict will not be sustained where testimony is at variance with physical facts and repugnance is material and self-evident.''

The sum total of the above definitions is that, if the word ''substantial'' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with ''any'' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be ''substantial'' proof of the essentials which the law requires in a particular case. Applying the foregoing definitions, and having regard for the well established legal standards of testamentary capacity, it cannot justly be said that the trial court's conclusion to the effect that Miss Teed was mentally incompetent, is supported either by law or by ''substantial'' evidence. To sanction such a conclusion herein would in effect

amount to a judicial pronouncement that old age with its accompanying disabilities is an almost insurmountable obstacle to the execution of a valid will. Such is not the law either in this state or elsewhere.

The rule of testamentary capacity is well stated in the recent case of *Estate of Lingenfelter*, 38 Cal.2d 571, 581 [241 P.2d 990] (March 14, 1952), where the Supreme Court says: "The most that can be drawn from all the accounts of her conduct is that she was ill, weak, highly nervous and excitable, and prone to violent outbursts of neurotic temper. The acts which led certain witnesses to express the opinion that she was of unsound mind has no bearing upon her testamentary capacity." The court then quotes from *Estate of Perkins*, 195 Cal. 699, 703 [235 P. 45], as follows: "every mental departure from the normal will not destroy a testamentary disposition. . . . Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument."

Particularly applicable to the instant case is the following quotation from the same opinion: "Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act." At most, the alleged supporting evidence relied upon by respondents merely presents an ordinary, clinical picture of a very old lady, beset with various physical ills. This, under the rule just stated, is insufficient to disqualify a testatrix from testamentary disposal.

idly," and unable to enunciate clearly, and thought the

The witness Jane Morgan found Miss Teed "failing rapidly," patient's mind "was affected." Dr. Lacey characterized the patient as a "crotchety old lady" whom "nothing would please," and opined that "anyone with a history that she had . . . never does recover their mental equilibrium." Dr. Lacey admittedly had no personal knowledge of Miss Teed's condition since in September, 1948, several months before

the will was made, at which time the doctor had seen the patient on two occasions. Dr. Parkin, who had never seen decedent, was confronted with Miss Teed's letter, written December 13, 1948, and containing an intelligent discussion of books by Toynbee and Churchill. In answer to the question, ''Would you say that the author of that statement (Miss Teed) was of unsound mind?'', stated, ''It doesn't sound like it to me.''

The hospital chart makes no mention of any mental unsoundness or of any facts from which such an inference might be drawn. On the contrary it particularly notes that although nervous and uncomfortable, on the day the will was made, Miss Teed was able to read, visit with a nurse, and to confer with attorneys.

█ The other items of evidence relied upon as showing incompetency, namely, former wills making other dispositions of property, and Miss Teed's use of certain language in the will here in question, add nothing to the sum total so far as proving any mental disqualification. The very purpose of making a new will, in most instances, is to effect a change in disposition of testator's property. █ Also, the use of nonlegal terms in testamentary instruments casts no slur upon a testator's competency even though a court may later be called upon to interpret such terms.

A survey of the entire record indicates that only by the use of conjecture and surmise, or by effecting a complete change in the law of testamentary capacity, can the judgment be sustained. So far as opinion evidence is concerned, it is fundamental that without some substantial basis therefor, a lay opinion is without value. Likewise, the *ipse dixit* of the most profound expert proves nothing except it finds support upon some adequate foundation.

The record is full of letters from Miss Teed bearing dates all the way from October 28, 1948, to a week before death, in which are intelligently discussed all sorts of business, financial, social and other matters with a definiteness and understanding apparently well above average. Such matters as tax returns, trust distribution, accounts and bookkeeping, receive such attention as could only come from a keen, intelligent mind. Testimony of the two attorneys who prepared the last will indicates that the testatrix read and fully understood the document, and understandingly said, ''Mr. Olson, this will make my relatives mad,'' which the present litigation proves to have been a correct prophesy.

As hereinbefore indicated, the present inquiry involves not only the matter of "substantial" evidence, but more important still, the correct law of testamentary capacity. That the courts of this state have shown no tendency towards restricting or altering the long established rule is evidenced by the recent case of *Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990], hereinbefore mentioned. Neither in that case, nor in any other, can expression of law be discovered which can be legitimately construed as disqualifying the testatrix herein.　█　The presumption is that a testatrix is competent, and substantial evidence other than guesswork and general conjecture should be required to rebut such presumption. Such evidence does not appear in the instant case.

Even though testatrix had reached the age of 93 years, was sick, feeble and failing, and even though the patient had a history of arteriosclerosis and other concomitants of old age, the same rule exists. As said in appellant Childrens Hospital's brief, "Giving respondents the benefit of every legitimate inference possible from the record, the fact stands out that they have not brought the case within the rule."

The judgment is reversed.

White, P. J., and Drapeau, J., concurred.