Filed 10/28/14  In re Hailey B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re HAILEY B. et al., Persons Coming Under the Juvenile Court Law. | D065577 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | (Super. Ct. No. J518412C-D) |
| Plaintiffs and Appellants, | |
| v. | |
| TERRI B. et al., | |
| Defendants and Respondents; | |
| HAILEY B. et al., | |
| Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Cynthia A. Bashant, Judge.  Reversed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Appellant Hailey B, a Minor.

Amy Z. Tobin, under appointment by the Court of Appeal, for Appellant K.B., a Minor.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Appellant.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Respondent Terri B.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Respondent Leon B.

Minors Hailey B. and K.B. and the San Diego County Health and Human Services Agency (Agency) appeal the juvenile court's selection of legal guardianship as the minors' placement at the contested Welfare and Institutions Code[1] section 366.26 hearing. Appellants contend the juvenile court erred by finding that, although the minors were adoptable, the sibling bond exception to adoption (§ 366.26, subd.(c)(1)(B)(v)) applied. We conclude the juvenile court's determinations are not supported by substantial evidence and reverse.

FACTUAL AND PROCEDURAL BACKGROUND

*Detention*

Leon B. and Terri B., husband and wife, are the parents of Kayla (now 15 years old), Troy (now 12 years old), Hailey (now eight years old), and K.B. (now four years

---

[1]     All further statutory references are to the Welfare and Institutions Code.

old). They were also the prospective adoptive parents of their nephew, Daniel B. (now 11 years old), who began living with them in May 2009.

In May 2012, a relative found Daniel, then eight years old, handcuffed to his bed and complaining of hunger. The relative also found an infant in a baby carrier in the closet of Daniel's room. The relative removed Daniel from the home and called the police. Daniel reported Terri kept him handcuffed to his bed, deprived him of food, and physically abused him. Terri made Daniel wear diapers; poured buckets of cold water on him; made him stand in a bathtub with ice; shoved feces, urine, and soap in his mouth; and beat him. Leon tried to prevent Terri from abusing Daniel, but was unsuccessful. The day before Daniel was found, Terri hit him with a bottle, punched him in the stomach, and stomped on his head because she caught him sneaking food.

Police arrested Terri and Leon for felony child cruelty and transported the children to the Polinsky Children's Center (Polinsky). A physician examined Daniel and observed several bruises all over his body and noted his "extremely thin" appearance. The physician opined Daniel had been subjected to cruel and inhumane treatment and had been tortured. A full skeletal x-ray revealed that Daniel's bones were demineralizing and underdeveloped.

The Agency filed petitions alleging under section 300, subdivision (a) that the parents' four biological children were at substantial risk of harm due to the parents' abuse

of Daniel.[2]  The Agency later amended the petition concerning K.B. after she tested positive for cocaine—likely transmitted from Terri while breastfeeding—when she was admitted to Polinsky.  At the detention hearing held on May 10, 2012, the juvenile court found a prima facie case had been made as to all four children and ordered them detained.

*Jurisdiction and Disposition*

All four children were detained together in the licensed foster home of Linda and Lance H.  Linda already knew the family because she had previously adopted Terri's half-sister.[3]  The trial court in the parents' criminal case issued a protective order preventing the parents from having contact with their children or any person living in the home where the children are placed.  The children revealed in interviews with Agency social workers that they had either seen Daniel handcuffed to his bed or knew that he had been.

At the contested jurisdiction and disposition hearing held in June 2012, the juvenile court sustained the allegations in the petition and assumed jurisdiction over all four children pursuant to section 300, subdivision (a).  The court ordered the children removed from parental custody and placed in foster care.  The court further ordered reunification services for both parents and supervised visitation once the criminal protective order was lifted.! (4 CT 774, 777.)!  The court set six- and 12-month review hearing dates.

---

[2]     Daniel was not a party to the underlying dependency case (he was already the subject of a separate dependency) and is not a party to this appeal.

[3]     Linda and Lance have adopted eight other children and had 14 other foster children.

4

*Six-Month Review*

In its six-month status review report, the Agency reported changes in the children's placements. In July 2012, Linda requested that the Agency place the children elsewhere. Although Linda was willing to allow the girls to stay a while longer as the Agency looked for a placement that could accommodate all four children, she wanted Troy removed sooner because he had threatened her grandson and expressed concern that she was trying to kill him by poisoning his food. Troy was removed, and the girls were removed about two months later and returned to Polinksy. Linda and Lance visited the children at Polinsky nearly every day. The Agency was not able to locate a foster placement that would accommodate all four children. Kayla was placed in the foster home of Gretchen and Chris M., Troy and Hailey were placed in the foster home of Theresa H., and K.B. was placed with Linda and Lance again. The Agency committed to maintaining weekly visits for the siblings.

The Agency reported Leon had participated in services, but sill did not understand the impact the trauma had on his children. Terri made only minimal progress in services. The Agency recommended the court order an additional six months of services. The court ordered that reunification services continue an additional six months and that the Agency provide the resources to allow continued sibling visits.

*12-Month Review*

At the 12-month review hearing, the Agency reported the children's placements remained the same. Kayla's foster parents, Gretchen and Chris, were willing to provide long-term care for her. Hailey and Troy's foster mother, Theresa, had requested and been

5

granted de facto parent status and was willing to provide long-term care for those children and possibly also for Kayla and K.B. The children were all very happy in their foster homes.

The foster parents were working together to ensure the children maintained sibling bonds. The children were visiting each other frequently. They were scheduled to visit twice each week, but regularly saw each other more frequently than that. Kayla often spent the weekend at Troy and Hailey's foster home, and also spent the day at K.B.'s foster home to spend time with her. Kayla, Troy, and Hailey were participating in "camp connect" events, which are activities designed to keep sibling bonds intact.

At the 12-month review hearing, the juvenile court terminated the parents' family reunification services and set a section 366.26 hearing.

*Special Hearing & Changes in Placement*

Based on concerns specific to Troy and Hailey's placement, as well as more generally regarding foster home licensure, the Agency removed Troy and Hailey from Theresa's home in September 2013 and placed them with K.B.'s foster parents, Linda and Lance. The Agency reported Troy and Hailey had transitioned well into their new placement. Kayla spent the majority of her weekends and most of her Thanksgiving break at Linda and Lance's home. At the Agency's request, the court terminated Theresa's de facto parenthood status as to Troy and Hailey.

In the meantime, Kayla's foster parents requested de facto parent status over her. Kayla opposed the request because she wanted to have her own voice in the dependency

process. The court granted the foster parents' request, but also granted Kayla's request that she be allowed to participate in her siblings' cases.

*Section 366.26 Hearing*

In connection with the section 366.26 hearing, the Agency reported all four children were adoptable. Kayla opposed adoption for herself and her siblings. Her caregivers were unwilling to adopt her and wanted to wait until after the parents' criminal trial concluded before considering taking guardianship of her. The Agency recommended keeping Kayla in her current placement under a permanent plan of "Another Planned Permanent Living Arrangement" (APPLA).

Troy also objected to being adopted, but wanted to remain with Linda and Lance and wanted them to be his and his younger sisters' guardians. Linda and Lance were willing to adopt Troy, but wanted to respect his wishes and were therefore willing to take guardianship of him. The Agency recommended a permanent plan of guardianship for Troy.

Hailey wanted to stay with Linda and Lance "forever," but stated she did not want to be adopted " 'because Troy isn't going to be adopted.' " K.B. was too young to understand the concept of adoption, but appeared to have a bond with Linda and Lance and called them " 'Mommy and Daddy.' " The Agency concluded "[t]here is no question that adoption is the best plan for Hailey and [K.B.] . . . ."

Linda and Lance were willing to adopt all four children, but respected Kayla's and Troy's wishes that they not be adopted. Linda and Lance were also willing to take guardianship of Kayla if she wished.

7

The Agency stated "[i]t is very clear at the children are very close and have a loving relationship," but opined "[t]erminating the parental rights in regards to Hailey and [K.B.] will not affect the sibling relationship because Troy will continue to reside in the same home as Hailey and [K.B.] under the permanent plan of Guardianship, and Kayla['s] current caregivers remain committed in facilitating on-going visits as well as the caregivers of Troy, Hailey and [K.B.]  Additionally, if Kayla requests or requires a change of placement, Troy, Hailey and [K.B.]'s caregivers are willing to provide Kayla with a permanent plan."  The Agency reported both sets of caregivers have a respectful relationship, communicate with each other weekly, and are committed to "continue having this relationship so that the children can grow up together and have shared experiences . . . ."

At the hearing, the juvenile court received in evidence the Agency's section 366.26 report and addenda and heard live testimony from Kayla, the social worker, and other witnesses called by the parents.  The court also received the stipulated testimony of Hailey and Leon.  In closing argument, counsel for Hailey and K.B. argued the juvenile court should order adoption for the two girls.  Kayla argued the court should apply the sibling relationship exception and order a guardianship instead.  The parents also argued against adoption on the grounds of both the sibling relationship and parent-child beneficial relationship exceptions.  The court found all four children adoptable, found the parent-child beneficial relationship inapplicable, but applied the sibling relationship exception as to all of them.  The court ordered a permanent plan of legal guardianship for Troy, Hailey and K.B., and a permanent plan of APPLA for Kayla.  At a later hearing,

8

the court ordered that Linda and Lance be the guardians of Troy, Hailey, and K.B. The court further ordered regular visitation among them and Kayla.

Hailey, K.B., and the Agency appealed.[4]

DISCUSSION

I.

The parties do not dispute the siblings shared strong bonds. Despite those bonds, however, Appellants contend the juvenile court erred by applying the sibling bond exception because substantial evidence did not support a finding that freeing Hailey and K.B. for adoption would interfere with the siblings' bonds. And even if there were such interference, Appellants further contend substantial evidence did not support a finding that maintaining the siblings' bonds outweighed the benefits of a permanent plan of adoption for Hailey and K.B. We agree.

A. *Governing Law*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) The court may order one of three alternatives: adoption, legal guardianship, or long-term foster care. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); § 366.26, subd. (b)(1)-(5).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*Autumn H.*, at p. 573.) Adoption necessarily involves termination of the biological parents' legal rights to the child. (*Id*. at p. 574.) Once the court determines by

---

4    We will hereinafter refer to Hailey, K.B., and the Agency collectively as Appellants because they have each joined in one another's briefs to the extent arguments raised therein inure to their respective benefits.

9

clear and convincing evidence that a child is likely to be adopted, a party opposing adoption must show that option would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

Section 366.26, subd. (c)(1)(B)(v) provides an exception to termination of parental rights when severing a sibling relationship would be detrimental to the dependent child. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 998 (*Valerie*).) To establish detriment under this exception, the party opposing adoption must show by a preponderance of the evidence that "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); *Valerie*, at p. 998.) The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 54-55.) We have previously stated "application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*Valerie*, at p. 1014.)

"A sufficiency of the evidence standard of review applies to the sibling relationship exception." (*In re D.M.* (2012) 205 Cal.App.4th 283, 291; *In re L.Y.L.*

10

(2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).)[5]  The appellant has the burden of showing that substantial evidence does not support the court's finding.  (*Ibid*.)  "[S]ubstantial evidence is not synonymous with *any* evidence."  (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.)  Rather, it is evidence that is "reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case."  (*In re Teed's Estate* (1952) 112 Cal.App.2d 638, 644.)  "A decision supported by a mere scintilla of evidence need not be affirmed on appeal."  (*In re Savannah M*., at p. 1393.)  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]."  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)  (Italics added.)  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652.)

---

5      Both Leon and the Agency urge us to apply the hybrid standard of review applied in *In re Bailey J*. (2010) 189 Cal.App.4th 1308 and *In re J.C*. (2014) 226 Cal.App.4th 503.  We have consistently applied the substantial evidence standard of review to challenges to orders determining the applicability of exceptions to adoption.  (See, e.g., *Autumn H*., *supra*, 27 Cal.App.4th 567; *L.Y.L*., *supra*, 101 Cal.App.4th 942; *In re Megan S*. (2002) 104 Cal.App.4th 247, 251; *In re Naomi P*. (2005) 132 Cal.App.4th 808 (*Naomi P*.); *In re Christopher L*. (2006) 143 Cal.App.4th 1326, 1333; *In re Michael G*. (2012) 203 Cal.App.4th 580, 593-594.)  In any event, we need not decide whether to apply the hybrid standard here because neither Leon nor the Agency have explained, and we do not see, how applying that standard of review would result in a different outcome here.

11

*B.*     *Analysis*

    *1.*     *Substantial Interference With a Sibling Relationship*

The sibling bond "exception . . . applies only when adoption would result in 'substantial interference with a child's sibling relationship.' " (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 293.)  Appellants contend no substantial evidence supports the trial court's finding that there would be a substantial interference with Hailey and K.B.'s sibling relationships if they were freed for adoption  They argue the trial court's finding was based, instead, on unsupported speculation.

Appellants recite the abundant evidence establishing Linda and Lance's stated commitment to maintaining the siblings' bonds with one another was more than mere assurances, but rather, consisted of a proven track record.  Regarding Hailey's and K.B.'s respective relationships with Kayla, Linda and Lance were willing to adopt Kayla, too, and reunite her with all her other siblings, but respected her wishes that she not be adopted.  Short of adoption, Linda and Lance "time and time again" helped Hailey and K.B. (and Troy) maintain a sibling relationship with Kayla.  Kayla visited her siblings at least weekly—occasionally more frequently—and often spent weekends and at least one holiday week at Linda and Lance's home.  Kayla was allowed to call her siblings whenever she wanted and spoke with Troy almost daily and with Hailey and K.B. several times per week.  When Kayla's caregivers were unable to transport Kayla to visits, Linda transported her.  On one occasion when Kayla and Troy were in court and had no one to call, Kayla called Linda to take her and Troy to lunch.  Linda came right away.  Kayla testified Linda and Lance never interfered with her efforts to see her siblings, and Linda

12

also helped arrange special visits. Kayla stated Linda told her she was welcome in her home anytime. Linda also included Kayla in the family Christmas photo. Both sets of caregivers remained committed to allowing continued visits between Kayla and her siblings, and Linda and Lance were committed to doing so even if Kayla changed caregivers.

As for Troy, Linda and Lance also wanted to adopt him, but respected his wish that he instead be placed with them under a guardianship. And because the juvenile court placed Troy in the same home as his younger sisters—regardless of whether they were placed for adoption or guardianship—there are no immediate concerns regarding visitation or maintenance of Hailey's or K.B.'s sibling relationships with him.

Although not directly germane to the sibling bond exception, Appellants observe Linda and Lance also facilitated and supervised numerous visits among Troy, Hailey, K.B. and their extended relatives. The caregivers allowed the maternal great-grandmother to phone the children every night and never placed any limitations on phone calls between the children and their relatives. Linda also made the children available two to three times per week to speak with other relatives.

The parents argue,[6] despite this evidence, that "*if*" Linda and Lance's guardianship over Troy were terminated or "*if*" Kayla had a change of placement, there "*could be*" problems facilitating visits, which would result in a substantial interference with the sibling relationships. (Italics added.) For these reasons, the parents contend the juvenile

---

6    We refer to Terri and Leon collectively as the "parents" because they each joined in the other's arguments to the extent they inure to their respective benefits.

court had a "right to be concerned" and could "logically infer that changes in placements could result in future problems with sibling visitations." These "concerns," however, were nothing more than improper speculation.

The juvenile court's remarks mirror that speculation:

> "And I understand what everybody is arguing, that these visits can last forever, and that Linda's very open to those."

> "But there are so many things that can happen over the next 15 years of [K.B.]'s life until [K.B.] turns 18. There are so many different permutations that could lead to a decision not to allow contact."

> "Right now, the children are all doing really well, as far as their behaviors go. So everybody's happy to have them all together, but we have seen many, many cases in this court where an older sibling starts to act out, and there starts to be issues. Then the caretaker says, 'I think you're a bad influence on my adoptive children,' there's a lot coming up in the future that could affect the children."

> "I just am not as convinced as -- as some of the other people are, that we can be guaranteed that these visits -- that this sibling contact is going to last forever, and I think these children need to go together as a sibling group."

The parents do not direct us to any substantial evidence to support the trial court's conclusion. They argue that because Linda and Lance returned Troy (and eventually the other siblings) at the outset of the dependency, they are likely to do so again, resulting in different placements and jeopardizing visitation. This is pure speculation based on stale evidence. Linda and Lance initially requested that Troy be removed because of his aggressive behaviors. At that time, the children had only just been removed from their parents, were contending with the loss of their relationship with their cousin Daniel, and felt anger and protectiveness toward their parents. Linda asked Troy's therapist for help,

14

but received no response. By the time of the section 366.26 hearing 18 months later, however, Troy had progressed in his therapy, recognized that his previous behaviors "were not okay," and wanted to remain with Linda and Lance. In October 2013, Troy's therapist "had no concerns at that time regarding Troy." Moreover, the Agency, in a collaborative effort among several of its social workers, Troy's therapist, and others involved, took into account the children's initial return to Polinsky when recommending adoption for Hailey and K.B. Additionally, by the time of the hearing, Linda and Lance had a proven track record of caring for the children and facilitating visits among them— they had cared for K.B. for 21 months,[7] and Troy and Hailey for almost six months. All in all, this evidence is akin to evidence other courts have deemed substantial for purposes of finding the sibling bond exception inapplicable. (See, e.g., *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 ["There is also no evidence that the relationships between any of the siblings will necessarily cease upon termination of parental rights. The grandparents have said they want to continue a relationship with their grandson Noah, and they are open to maintaining ties between Autumn and Jacob and their siblings. The grandparents have done so thus far, and there is no evidence they intend to stop once they have adopted Autumn and Jacob."]; *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422 ["there is nothing in this record to suggest that the brothers' relationship would be

---

[7]    There was a one-month gap when K.B. returned to Polinsky before returning to Linda and Lance's care. Even during that month, Linda and Lance visited the children at Polinsky nearly every day.

terminated, as both [the mother] and the grandmother have indicated they recognize the value of the sibling relationship."].)[8]

The parents suggest their then-upcoming criminal trial may trigger Troy to regress to the behaviors that led to his return to Polinsky at the outset of the dependency. However, given the overwhelming evidence of Troy's progress, the parents' argument is unsupported speculation that does not rise to the level of substantial evidence. (See, e.g., *In re Salvador M.*, *supra*, 133 Cal.App.4th at p. 1422 [mother "maintains that even if the grandmother adopted Salvador, the sibling relationship between him and Joseph would still be at risk because the grandmother is merely the legal guardian of Joseph, who is subject to removal. We reject this theory as too speculative."].)

The parents contend the juvenile court's ruling is further supported by a visitation dispute that occurred between Linda and Lance, on the one hand, and Troy and Hailey's prior caregiver, Theresa, on the other hand. According to Terri, Linda and Lance "were accused of preventing [K.B.] from spending some time with her other siblings." Terri's record citation contradicts this assertion—she cites Linda's testimony that she (Linda) "would like to start having more visits for [K.B.] with her siblings, but [was] having a little bit of resistant [sic] from the other foster mom in allowing [K.B.] to go with her

---

[8] We recognize *In re Jacob S.* and *In re Salvador M.* are procedurally distinguishable in that both cases affirmed juvenile court decisions finding the sibling bond exception *inapplicable*. We nonetheless find the cases instructive for the proposition that stakeholders' intentions regarding continued visitation are relevant to our analysis of the exception's applicability. *Naomi P.*, *supra*, 132 Cal.App.4th 808 is also instructive in this respect because, in finding the sibling bond exception *applicable*, the juvenile court doubted the caregiver's intentions regarding the significance of the siblings' bond. (*Id.* at pp. 821, 824.)

16

sibling somewhere."  The supposed dispute was also with Theresa, the caregiver from whom Troy and Hailey were abruptly removed for safety and licensure issues.

The parents also argue that because Kayla was already visiting her siblings less frequently by the time of the section 366.26 hearing, freeing Hailey and K.B. for adoption would somehow result in even less frequent visits.  It is undisputed, however, that Kayla did not visit with her siblings as much as she would have liked due to her own social calendar (including her understandable decision to visit with other relatives instead) and her siblings' school and sleep schedules.  Kayla acknowledged Linda and Lance never interfered with efforts to visit her siblings, but rather, facilitated additional special visits.

The parents insinuate that because Linda and Lance are in their 70s, and will therefore be in their 80s when Hailey and K.B. are teenagers, they will somehow become less inclined to allow sibling visits in the future.  Absent any evidence beyond merely reciting their ages, we reject this argument as speculative.  (See, e.g., *In re Salvador M.*, *supra*, 133 Cal.App.4th at p. 1422 ["There was no evidence in the record that the grandmother and grandfather were too old or had other infirmities that might render them unable to continue as Joseph's guardian."].)[9]

The parents argue the juvenile court's application of the sibling bond exception here is supported by *Naomi P.*, *supra*, 132 Cal.App.4th 808, in which the juvenile court's application of the same exception was affirmed on appeal.  Though procedurally analogous, we find *Naomi P.* factually distinguishable because, unlike here, the social

---

[9]    Linda is a stay-home caregiver and Lance is a semi-retired physician.

worker there never saw the children interact (*id*. at p. 820), and the juvenile court made credibility determinations (*id*. at p. 824) and doubted the caregiver's appreciation for the strength of the siblings' bond (*ibid*.).

In short, while the parents are correct that "there would be no guarantee" that the children could continue to visit each other if Hailey and K.B. were freed for adoption, there is no substantial evidence in the record—only speculation—to support a finding that visits would not continue. Accordingly, the juvenile court erred in applying the sibling bond exception.

2. *The Weighing of Benefits*

Because we have already concluded the juvenile court erred in applying the sibling bond exception due to a lack of substantial evidence of interference with the siblings' relationships, we need not consider whether the court also erred by finding the benefits of maintaining the sibling bond outweighed the benefits of adoption. But even if we were to consider the juvenile court's weighing analysis, we would find that it also fails for a lack of substantial evidence because it was based on the same speculative, unsupported finding that sibling visits may end if Hailey and K.B. are freed for adoption.

After acknowledging the strength of the siblings' bonds, the juvenile court stated,

> "Now, that said, I understand that I have to balance that against the younger children's need for stability and permanency. And there's no question that they're thriving in the current home, that that is -- is generally a very, very strong need, and that these are young girls. And I understand that they want to remain with Linda and Lance forever, and I certainly hope that that is possible for them."

> "However, this is not a case where -- where normally I can say the need for stability and permanency outweighs any bond to the

18

siblings. I think these girls would be devastated if they did not have contact with their siblings. And I understand what everybody is arguing, that these visits can last forever, and that Linda's very open to those."

"But there are so many things that can happen over the next 15 years of [K.B.]'s life until [K.B.] turns 18. There are so many different permutations that could lead to a decision not to allow contact."

The juvenile court thus concluded the young girls' "very, very strong need" for a stable environment in which they can thrive was outweighed by the speculative, unsupported risk that they may lose contact with their siblings. For the reasons discussed above, this was error.

We note the parents devote most of their briefing on this issue to the strength of the siblings' bonds. Terri never addresses the benefits of adoption. Leon does so only by challenging the social worker's weighing analysis as consisting of "nothing more than conclusory statements with no supporting evidence." We disagree. The social worker was assigned to the case as the adoptions social worker six months prior to the section 366.26 hearing, wrote several reports, interviewed the caregivers in detail and at length, interviewed the children, observed Hailey and K.B. in Linda and Lance's home, and made observations of the relationships between the siblings.

In any event, because the juvenile court's weighing of benefits was based on its speculative, unsupported finding regarding the possible interference with the siblings' bonds, its weighing of benefits is likewise unsupported by substantial evidence.

19

## DISPOSITION

The orders are reversed.  The juvenile court is directed to vacate its selection of guardianship as the permanent plan for Hailey and K.B. and to enter orders terminating parental rights and placing Hailey and K.B. for adoption.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.